UNION MUTUAL LIFE INSURANCE COMPANY, Plaintiff-Appellee-Cross Appellant,

v.

UNITED STATES of America, Defendant-Appellant-Cross Appellee.

Nos. 77–1161 and 77–1162.

United States Court of Appeals, First Circuit.

Argued Sept. 9, 1977.

Decided Feb. 1, 1978.

Gary R. Allen, Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom Myron C. Baum, Acting Asst. Atty. Gen., Washington, D. C., George J. Mitchell, U. S. Atty., Portland, Me., and Gilbert E. Andrews, Atty., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for United States.

Bruce A. Coggeshall, Portland, Me., with whom Pierce, Atwood, Scribner, Allen & McKusick, William C. Smith, and James F. Keenen, Portland, Me., were on brief, for Union Mutual Life Insurance Co.

Before COFFIN, Chief Judge, TUTTLE,* Circuit Judge, WOLLENBERG,** District Judge.

TUTTLE, Circuit Judge.

This is an appeal by the United States and a cross-appeal by the Union Mutual

---

* Of the Fifth Circuit, sitting by designation.

** Of the Northern District of California, sitting by designation.

Life Insurance Company from the judgment of the trial court which resolved four of the grounds stated in Union Mutual's complaint in its favor and two in the Government's favor. The United States appealed only with respect to two of the matters which the trial court decided in favor of Union Mutual. *See Union Mutual Life Ins. Co. v. United States,* 420 F.Supp. 1181 (D.Me.1976).

### INTRODUCTION: THE TAXING FORMULA

We adopt the trial court's statement as a concise and accurate description of the purposes and framework of the 1959 Life Insurance Company Tax Act:

The purpose of the 1959 Act was to come to grips with certain difficulties inherent in the income taxation of life insurance companies. The two principal difficulties identified by Congress were (1) the need to determine what portion of a company's investment income is properly allocable to reserves which the company must hold for the purpose of meeting the company's future obligations to policyholders, and what portion is properly considered income taxable to the company and (2) the problem of calculating underwriting income on a yearly, as opposed to a long-term basis. *See* S.Rep. No.291, 86th Cong., 1st Sess., 1959 U.S. Code & Ad.News 1577–82. The first step in Congress' approach to these difficulties was to decide that a life insurance company's taxable income would be calculated in three distinct parts or "phases." *Id.* at 1576. In Phase I the taxable portion of the company's investment income—its "taxable investment income"—is computed. Sections 804–806. In Phase II the company's gain (or loss) from operations—its "underwriting gain"—is computed. Sections 809–812. In Phase III the company's taxable income owing to certain distributions to stockholders is computed. Section 815. Once each of these amounts has been computed, the company's taxable income is then computed under Section 802(b) to equal the sum of (1) the lesser of Phase I or Phase II income; (2) 50% of the excess, if any, of Phase II income over Phase I income; and (3) Phase III taxable income, if any. The sum thus calculated—the company's "life insurance company taxable income" —is then taxed at the normal corporate rate. Sections 802(a), 11.

The issues presented in the instant case directly concern only Phase I of the overall computation, that is, the computation of the company's taxable investment income. The purpose of Phase I, simply stated, is to divide the company's investment income into two parts, that portion which is allocable to reserves held to meet the company's obligations to policyholders, which is not taxed; and that portion which is available to the company for other purposes, which is taxed. The Phase I computation proceeds as follows:

(1) For the taxable year in question, the company calculates its "gross investment income" by adding together interest, dividends, rents, royalties and other income derived from investments or any trade or business other than the insurance business. Section 804(b). From this amount the company deducts items allowed as deductions, such as investment and investment-related expenses. Section 804(c). The result is the company's "investment yield" for that taxable year. *Idem.*

(2) The company then calculates its "assets," Section 805(b)(4), as of the beginning and end of the taxable year and computes the mean thereof.

(3) The company then calculates its "current earnings rate" by dividing its investment yield by the mean of its assets. Section 805(b)(2). It also calculates its "average earnings rate" by computing the average of its current earnings rates for the present and last four taxable years. Section 805(b)(3). The lower of the current and the average earnings rates is the company's "adjusted reserves rate." Section 805(b)(1).

(4) The company then calculates its "adjusted life insurance reserves." Section 805(c). To do this:

(a) The company first calculates the mean of its "life insurance reserves," as defined by Section 801(b) as of the beginning and end of the taxable year. Section 805(c)(1)(A).

(b) The company then calculates the weighted average of the interest rates which it has assumed for the purpose of calculating its life insurance reserves. Section 805(c)(2). This figure, which may be termed the company's "average rate of assumed interest," is then deducted from the adjusted reserves rate.

(c) The company then determines its "adjusted life insurance reserves" by reducing its life insurance reserves by 10% for each 1% by which the adjusted reserves rate exceeds the average rate of assumed interest. Section 805(c)(1).

(5) The company then multiplies its adjusted life insurance reserves by its adjusted reserves rate. The result, with certain adjustments not at issue here, is the company's "policy and other contract liability requirements" (policy liability requirements) for the taxable year. Section 805(a)(1).

(6) The company then divides its policy liability requirements by its investment yield. The result is the percentage of investment income which the company may allocate to reserves held for the purpose of meeting its obligations to policyholders. Section 804(a)(1). The remaining portion of the investment yield, less certain deductions not at issue here, represents the company's taxable investment income. Sections 802(b)(1), 804(a)(2).

*Id.* at 1185–86 (footnote omitted).

Each of the issues presented on this appeal relates to one or more of the six steps of the Phase I computations. Since both parties address the separate issues in the same sequence in their briefs, we here discuss them in that same order.

I.  Whether the district court correctly decided that interest on policy loans charged in advance to policyholders is includable in full in taxpayer's investment income under the pertinent provisions of the Life Insurance Company Income Tax Act of 1959 (sections 801–820 of the Internal Revenue Code of 1954, as amended) at the time such advance interest is received in cash or added to the principal balance of the policy loan in question.

■  The insurance policies issued by Union Mutual entitled the policyholder to obtain a loan up to the amount of the cash surrender value on the sole security of the policy itself. Annual interest on such loans is payable in advance. Thus, unless the policyholder pays the interest in advance in cash, the taxpayer charges such interest in advance from the date of the loan until the next anniversary date of the policy by adding the interest to the loan balance shown on its books, reducing the cash surrender value by that amount. If the policyholder does not pay the second annual interest installment in cash, it is also charged in advance by adding the amount of such interest to the principal of the loan.

If the policyholder repays the loan during the year, he is credited with a pro rata amount of the interest that was deducted in advance. The same adjustment is made in the event the policy is surrendered or the policy matures on the death of the insured.

It is the taxpayer's contention that since the possibility of repayment, surrender or death makes it uncertain whether it will ultimately keep the entire amount of the interest, only that part of the interest payments that has been fully earned at the end of the tax period should be reported as income. Thus, the taxpayer reports only the "earned" portion of its advance interest charges as "investment income" on its annual statements, *i. e.,* it excludes from gross investment income that portion of such advance interest allocable to the period beyond December 31 of the year in question.[1]

---

1.  Taxpayer makes it annual statements and files its tax returns on a calendar year basis. Similarly, on its federal income tax returns for the years in question, Union Mutual excluded

substantial amounts of "unearned" advance interest from its reported gross investment income for such years.

As stated by the trial court, two courts of appeals had at the time of its decision held that where the full interest on a policy loan is due and payable in advance and an accrual basis taxpayer receives it free of any trust or other restriction on its use, the taxpayer's right to receive such interest must be regarded as "fixed" and therefore as accrued within the meaning of Regulation 1.446–1(c)(1)(ii), *citing Jefferson Standard Life Insurance Co. v. United States*, 408 F.2d 842 (4th Cir.), *cert. denied*, 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969) and *Franklin Life Insurance Co. v. United States*, 399 F.2d 757 (7th Cir. 1968), *cert. denied*, 393 U.S. 1118, 89 S.Ct. 989, 22 L.Ed.2d 122 (1969). To these cases there must now be added a decision by the Court of Appeals for the Fifth Circuit in *Southwestern Life Insurance Co. v. United States*, 560 F.2d 627 (5th Cir. 1977).

This treatment of the interest payments is consistent with the accounting methods required by the statute. Section 818(a) provides:

Method of accounting.—All computations entering into the determination of the taxes imposed by this part shall be made—

(1) under an accrual method of accounting, or

(2) to the extent permitted under regulations prescribed by the Secretary or his delegate, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

Except as provided in the preceding sentence, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

The accrual method of accounting referred to in the above section is defined in Treasury Regulation (26 C.F.R.) 1.446–1(c)(1)(ii):

Accrual Method. Generally, under an accrual method, income is to be included for the taxable year *when all the events have* *occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.* [emphasis added].

It is unclear to us whether the language of this regulation prohibits all deferrals of advance payments when an accrual method of accounting is mandated or adopted. However, given the presumption against such deferrals as discussed in *American Automobile Ass'n v. United States*, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961) and *Schlude v. Commissioner of Internal Revenue*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1962), and the holdings by the Fourth, Fifth, and Seventh Circuits noted *supra*, the fact that plaintiffs were not obliged to perform any additional services or provide any additional goods or capital to retain the advance interest, and the speculative nature of the repayment possibilities, we believe the deferral of income in this case would be beyond the scope of tax accounting permitted by the statute and regulation.

Plaintiff suggests two lines of argument to counter the above analysis and authorities. First, it contends that only prepaid income which is "earned" should be included as income. We are not certain exactly what the taxpayer is trying to connote with the term. If it is using the term in the conventional sense that by providing goods, capital, or services for which one receives payment, a party "earns" the payment, we see no reason why the lack of "earning" here is any different from that in *Schlude v. Commissioner of Internal Revenue*, 372 U.S. 128, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1962). If the customers in *Schlude* received the dance lessons they had paid for the previous year, the dance studio earned its money after the year in which it was required by the Supreme Court to report its income. The fact that some customers may not show up for their lessons is no more speculative than the possibility here that some borrowers may pay the principal of their loans ahead of time.

The real difference between *Schlude* and the present case is that the dance company

could retain all of the income it received from customers whether it performed the requisite services or not, while the prepayment of a loan required plaintiff to refund interest to its customers. Plaintiff cites a line of cases including *Gunderson Bros. Engineering Corp. v. Commissioner,* 42 T.C. 419 (1964) and *Bankers Union Life Ins. Co. v. Commissioner,* 62 T.C. 661 (1974), to suggest that this distinction requires that prepaid interest should not be included in income as long as it may have to be refunded. We find these authorities unpersuasive. *Gunderson* is totally inapposite. It simply permits the deferral of finance charges on car installment payments which were never received and which would have to be refunded if and when they were received if the purchaser paid the principal of his debt early. The decision in *Bankers Union* is on point, but we decline to follow its reasoning.[2]

We conclude that the trial court correctly ruled that interest on policy loans charged in advance are required by § 804(b)(1)(A) to be included in gross investment income.

II. Whether the district court correctly decided that taxpayer's "life insurance reserves" as defined in section 801(b) of the code do not include its reserves for unearned premiums in non-cancellable accident and health insurance.

In addition to life insurance policies, Union Mutual issues "non-cancellable" accident and health policies which provide for the payment of the same premium throughout the life of the policyholder or until the policyholder reaches a certain age. Such policies cannot be cancelled by the taxpayer so long as the policyholder continues to pay such premiums. Premiums are payable annually and in advance of coverage so that, as of the end of each calendar year, the company holds premiums relating to insurance coverage to be provided for in the next calendar year. Because the protection afforded must continue beyond the expiration of the current calendar year, taxpayer was required to reflect on its annual statements a reserve for "unearned premiums" on these non-cancellable accident and health insurance policies, based on the pro rata portion of the gross premiums paid by the policyholder allocable to the periods of unexpired coverage. The same kind of reserve was also required in the case of other types of accident and health insurance without the non-cancellation feature, as to which the company's obligation for protection extended only through the life of the outstanding policy.

With respect to non-cancellable coverage, an additional reserve was required. Although the annual premiums on such policies remain level, the cost of providing insurance coverage increases as the insureds grow older. Consequently, this additional reserve, as all parties recognized, reflects

---

**2.** To the extent that the court in *Bankers Union* based its conclusion that prepaid interest need not be included in income on *Gunderson,* we seriously question the logic of such an inference. If *Bankers Union* suggests that a potential obligation to refund a payment prevents that payment from being included as income, we believe the language of *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1933) refutes that position. In that case the Court, in discussing insurance commissions, stated, "The overriding commissions were gross income of the year in which they were receivable. As to each such commission there arose the obligation—a contingent liability—to return a proportionate part in case of cancellation. But the mere fact that some portion of it might have to be refunded in some future year in the event of cancellation or reinsurance did not affect its quality as income." *Id.* at 199, 54 S.Ct. at 359. *See also North American Oil Consolidated v. Burnet,* 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932).

It is obvious that in *Brown v. Helvering* the taxpayer had no future obligations to perform to retain his commission, while in the present case plaintiff was obliged to permit borrowers to keep the principal for the term of the loan in return for the interest payment. But the fact that capital might be retained into a subsequent year to earn the full interest adds little to the merits of plaintiff's claim. We do not see why prepayment of interest should be treated any differently from prepayment of rent and the latter has been held to be taxable in the year received for property made available through subsequent years. *See United States v. Williams,* 395 F.2d 508 (5th Cir. 1968).

the amount the company must retain and invest to meet the greater insurance cost ultimately expected over the extended life of the policy. It is computed on the basis of the "net premiums" received, *i. e.*, premiums received less the "loading" which, briefly, represents the company's costs and profits. It is the net level amount required, under a given set of interests and morbidity assumptions, to be set aside annually to enable the company to pay projected policy benefits throughout the life of the policy. The amounts thus accumulated from the current and past net premiums at the end of each year are known as the "terminal reserves." As stated, this is the reserve which must be held by the company at the end of the policy year to meet projected insurance costs in the future when the net premiums of the coming year alone will be insufficient for this purpose. For reporting purposes, the company strikes an average between the reserve at the end of the prior year and the reserve at the end of the current year to constitute what is known as the "mid terminal reserve." Although it had no comparable figure on its NAIC annual statements, Union Mutual confected a figure by reducing its gross unearned premium reserves to unearned *net* premium reserves and included this figure in "life insurance reserves" in addition to including the mid terminal reserves in life insurance reserves.

The Commissioner allowed the mid terminal reserves as a proper life insurance reserve, but disallowed the inclusion of the unearned premium amount as a life insurance reserve within the meaning of section 801(b). The trial court sustained the Commissioner's determination. The significance of this issue is that as the amount of "life insurance reserves" is increased, the taxable income of the insurance company is decreased.

Sections of the Internal Revenue Code must be the source from which we conclude whether or not unearned premiums on noncancellable policies are included in the term "life insurance reserves."

The first of these provisions is contained in section 801, "Definition of Life Insurance Company," which reads as follows:

(a) Life insurance company defined.— For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

(1) Its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50% of its total reserves (as defined in sub-section (c)).

26 U.S.C. § 801.

The second provision is contained in section 801(b), which provides as follows:

(b) Life insurance reserves defined.—

(1) In General.—For purposes of this part, the term "life insurance reserves" means amounts—

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

(2) Reserves must be required by law. . . .

26 U.S.C. § 801(b)(1), (2).

The third provision is contained in section 801(c), which provides as follows:

(c) Total reserves defined.—For purposes of subsection (a), the term "total reserves" means—

(1) life insurance reserves,

(2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and

(3) all other insurance reserves required by law.

26 U.S.C. § 801(c).

As we understand the positions taken by the parties, the Government contends that while it is appropriate for an insurance company, like any other taxpayer which has received advance payment calling for performance in a subsequent tax year, to set up on its books a reserve to represent the cost of performance of the contract for the remaining period of coverage, such a reserve is not contemplated within the statute defining "life insurance reserve." Taxpayer, on the other hand, contends that such a reserve meets the statutory definition because it is "estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest" and it is set aside "to liquidate . . . future unaccrued claims arising from . . . non-cancellable health and accident insurance contracts." See 26 U.S.C. § 801(b)(1)(A) and (B), supra.

To overcome the taxpayer's interpretation, it is necessary for the Government to take the position that since, by definition, the unearned premiums with which we are concerned are payments for a current year's protection, they are not within the definition of the statute which deals with amounts "which are set aside to liquidate . . . future unaccrued claims." (emphasis added). In sum, the Government claims that any claims arising under the current year's policy, for which the premiums have been paid, are not "future" claims at all.

One persuasive suggestion that this is the correct interpretation is that the taxpayer's obligation to furnish protection for the balance of a policy year for which the premium has been paid on a non-cancellable policy does not differ from the company's obligation to furnish protection for the balance of a policy year for a policy of cancellable health insurance. With respect to cancellable policies no reserves are required or set up for tax purposes to protect the company on its obligation to furnish such protection after the end of the year in which the premium has been paid.[3]

The trial court concluded, in the absence of court precedents dealing with this precise issue, that the "legislative history makes clear that in the 1942 Act Congress established a distinction, which has been preserved by the 1959 Act, between life insurance reserves and unearned premium reserves on non-cancellable accident and health policies." 420 F.Supp. at 1210.

Careful consideration of this legislative history and the trial court's opinion convinces us of its correctness, and we adopt that part of the opinion which deals with this issue. See 420 F.Supp. at 1207.

III. Whether the court correctly decided that taxpayer was entitled to deduct as "investment expenses" under sections 162 and 804(c)(1) of the code the costs it incurred in connection with investment projects which were abandoned rather than as losses under sections 165 and 809(d)(12) of the code at the time each project was abandoned.

▪ To frame this issue, we quote the Statement of Facts as announced by the trial court:

---

**3.** Plaintiff argues that part of the unearned net premium must be used to establish a "terminal reserve" at the end of the year sufficiently large enough to meet projected policy benefits due in the future. There is no dispute that the "terminal reserve" is used to meet "future unaccrued claims." Nor do we doubt plaintiff's contention that the prior year's "terminal reserve" plus the interest it generates could not provide for a sufficiently large new "terminal reserve" without some supplement from the current year's net premiums. However, we do not see why this should require the entire unearned net premium reserve to be considered as set aside for future claims. The only portion of the net premiums actually set aside become part of the "terminal reserve." By including the mid terminal reserve as life insurance reserves, the Commissioner has correctly differentiated between that part of the unearned net premium reserve designated to meet future claims and that part designated to be used during the current year.

The taxpayer regularly invests substantial sums of money in real estate, both through loans secured by real estate mortgages and by direct ownership of real estate. As a part of its real estate investment business, the taxpayer constantly watches for investment opportunities, and regularly reviews a variety of opportunities. The vast majority of opportunities which the taxpayer reviews never materialize. Two such aborted opportunities are at issue here:

(1) In 1967 the taxpayer became interested in a proposed real estate development in Newton, Massachusetts. The taxpayer decided to invest in the project, but only if the necessary rezoning could be obtained. Under the proposed arrangement, a corporation, Pentland Development Corporation (Pentland) was formed, which entered into a contract to purchase from the owner the parcel of real estate which was to be the site for the project. Pursuant to the terms of the taxpayer's agreement with Pentland, Pentland then assigned to the taxpayer its rights under the purchase agreement with the owner.

Pentland's attempt to secure the necessary rezoning of the property was unsuccessful. As a result, the taxpayer executed a release of the assignment of the right to acquire the property. Pentland had expended the sum of $14,632.56 in the attempt to secure the necessary rezoning and sought to have the taxpayer reimburse it for these expenses. The taxpayer denied any liability for these expenses. Ultimately, this dispute was resolved by the taxpayer paying to Pentland the sum of $10,000 as reimbursement of its expenses.

The taxpayer received no direct investment income from the expenses for which it reimbursed Pentland.

(2) In 1966 the taxpayer examined the feasibility of developing a new home office location and a shopping and business complex in the Monument Square area of Portland, Maine. For this purpose, the taxpayer hired a development consultant, Spencer M. Hurtt Associates, Inc., and an architectural firm, Geddes Brecher Qualls Cunningham, to study the Portland downtown area, to survey the space needs of a number of downtown businesses, and to make reports and recommendations to the taxpayer concerning the development of the area. The taxpayer also expended sums in attempting to acquire options to purchase land in the Monument Square area, for soil studies and for the reproduction of maps. A preliminary plan and a model of the area showing the preliminary development plans were prepared, as were architectural drawings detailing three or four of the potential buildings in the project.

In 1967 the taxpayer determined the Monument Square project to be unfeasible, and the project was discontinued. The taxpayer had expended the sum of $50,638.01 on the project as follows: (a) $32,867.26 to the development consultant; (b) $17,000 to the architectural firm for architectural studies and a wood model of the proposed development; (c) $500 to a consultant for attempting to obtain options to purchase real estate properties in the project area; (d) $262.41 to an engineering consultant for soil studies; and (e) $8.34 for reproducing maps of the project area.

The taxpayer received no direct investment income from its expenditures in connection with the Monument Square project. Had the project been completed as planned, 80% of it would have constituted an investment asset of the taxpayer and the remaining 20% its home office facility.

420 F.Supp. at 1194–95 (footnotes omitted).

The principal question presented as to these transactions is whether any of the amounts expended by the taxpayer in connection with the proposed Pentland and

Monument Square projects are deductible as investment expenses under section 804(c)(1). The taxpayer contends, and the trial court held, that these expenditures were properly deductible as "investment expenses for the taxable year." The Government, however, contends that the expenditures may be deducted only under section 809(d)(12). Although the amount of the deduction would be the same under either section, the effect is substantially different under the formulas used in computing taxable income for an insurance company. Inclusion of such expenditures under section 804(c)(1), and thus in the Phase I computation, would produce substantially higher tax benefits to the taxpayer than would inclusion under section 809(d)(12) and Phase II.

One of the difficulties in resolving this issue is that the statute, the regulations and the court decisions utilize words which have a specialized meaning in the particular context in which they are used. Fortunately, our task is somewhat eased by the fact that the district court and the parties agree that for the taxpayer to prevail, these expenditures must qualify as "ordinary and necessary expenses" under section 162 of the Code.

The Supreme Court has construed section 162 [4] and its predecessor sections as drawing the line between which expenditures may be deducted currently in the operation of a business and which must be capitalized and thus not be currently deductible. In *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), the Court said:

> Since the inception of the present federal income tax in 1913, capital expenditures have not been deductible. See Internal Revenue Code of 1954, § 263. Such expenditures are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or increasing the loss) when the

asset is sold. If an expense is capital, it cannot be deducted as "ordinary and necessary," either as a business expense under § 162 of the Code or as an expense of "management, conservation, or maintenance" under § 212.

> It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures.

*Id.* at 574–75, 90 S.Ct. at 1304 (footnotes omitted).

Consistent with the law as stated in *Woodward,* and as reiterated in *Commissioner of Internal Revenue v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1973), and *Commissioner of Internal Revenue v. Lincoln Savings & Loan Assoc.,* 403 U.S. 345, 354–55, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971), the trial court held:

> There is no question but that, as the taxpayer apparently concedes, expenditures incurred in investigating investment opportunities which ultimately materialize must be treated as capital expenditures. *Idem.* In such circumstances, the expenses of investigation are logically assimilated into the other costs of acquiring an asset "having a useful life substantially beyond the taxable year," Treasury Regulation 1.263(a)–2(a), 26 CFR § 1.263(a)–2(a), in compliance with the general principle that the costs of acquiring an asset be treated in a manner which reflects the asset's continuing production of income to the taxpayer.

420 F.Supp. at 1198 (citations omitted).

The court, however, drew a distinction between expenses of investigation and preparation for the acquisition of an asset which was ultimately acquired on the one hand, and the expenditure of such expenses "in the process of investigating an investment proposal which does not ultimately materialize as a capital asset" on the other. The court, in effect, decided that since the insurance company regularly investigated opportunities for investing its funds and in

---

4. Section 162. Trade or Business expenses.

(a) In General.—There shall be allowed as a deduction all the ordinary and the necessary

expenses paid or incurred during the taxable year in carrying on any trade or business

. . . . .

many cases subsequently decided not to undertake such projects, those investigations were a regular business of the company. Therefore, the attendant expenditures of money necessary to pay for fees and services to enable it to make its investment judgment was a regular business of the company and the expenditures were ordinary and necessary business expenses if, in fact, the company did not ultimately utilize the services so paid for in the creation of a capital asset. In other words, although the court recognized that if these two projects had come to fruition the expenditures that occurred in the tax year could not be deducted because they must be classified as capital expenditures under familiar tax law, here they could be expensed during the year in which they were paid out by the company,[5] since the projects did not come to fruition. It happens that the decision not to go forward with these projects occurred very shortly after the expenditures were made. Some of them, in fact, occurred during the same tax year. Presumably, the trial court's distinction between expenditures for unfulfilled projects and expenditures for projects that come to fruition would apply even though the development phases of a project might continue over several years before the company finally decides to go forward with it. In such situation, the expenditures would have to be kept in a state of limbo until a final decision is made if such decision did not occur during the same tax year.

The tax court dealt with a comparable situation in *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803 (1959). There the petitioner spent a substantial amount during the tax year in connection with the preparation and conduct of hearings before the Federal Communications Commission for the purpose of acquiring a television construction permit and ultimately a television license. The taxpayer sought to deduct the amount of these expenditures because of the uncertainty of the ultimate allowance by the FCC of the permit which it sought. The tax court said there:

Petitioner does not dispute that an existing television license is an asset of value, the amount of which is usually included in the purchase price upon the sale of the operating station and is to be capitalized. Petitioner argues, however, that the amount here in issue cannot be considered as an expenditure in the acquisition of a capital asset because during the year 1953 nothing was acquired nor was there any assurance that anything would be acquired. It points out that the television construction permit was not granted until 1956 and that as of the time of the hearing in this proceeding it had not received a television license because of the unresolved litigation concerning the construction permit. Therefore, petitioner argues that during 1953 it had received nothing for the expenditures involved which could properly be entered on its books as a capital asset. In effect, petitioner takes the position that until the license is finally and completely granted, and has proven itself to be of economic benefit, expenditures made for the purpose of acquiring the license may not be capitalized but are to be deducted as ordinary and necessary business expenses. Otherwise, it argues, the legal status of the expenditure may be suspended for a number of years. We do not agree. Petitioner has referred us to no authorities supporting its position and we are aware of none. The expenditures involved were all made for the purpose of acquiring a capital asset having a useful life in excess of one year and consequently were capital expenditures. The fact that petitioner may not be successful in its efforts to acquire the television license for Channel 10, Knoxville, Tennessee, is not sufficient to change the character of such expenditures or to constitute them ordinary and necessary business expenses.

*Id.* at 812.

The reasoning of the tax court in *Radio Station WBIR* is consistent with the holding by two courts of appeals that when expenditures for investigation or develop-

---

5. It should be noted that the Government concedes that when the taxpayer abandons a particular project these amounts can properly be charged off as losses under section 809(d)(12) in the tax year.

ment of proposed substantial investments have failed to work out, the amount represented by such expenditures may be taken as a loss under section 165 [6] of the Code or its predecessor section. In *Champlain Coach Lines v. Commissioner of Internal Revenue,* 138 F.2d 904 (2d Cir. 1943), the court held that amounts paid in an effort to seek a certificate of convenience and necessity for extending a coach line were finally deductible during the year when it was apparent that the planned expansion would not come to fruition. In *Stanley, Inc. v. Schuster,* 295 F.Supp. 812, 819–820 (S.D. Ohio 1969), *aff'd per curiam,* 421 F.2d 1360 (6th Cir. 1969), the court held similarly that an abandonment loss could be taken for the expenditure of architectural fees in the year when the taxpayer concluded that it would not go forward with the proposed improvement. Since it is completely foreign to federal income tax concepts that a taxpayer can elect to take either a deduction for expenses or a loss,[7] a court holding that expenditures looking to the acquisition of a capital asset that does not eventuate can be deducted as a loss in the year of its becoming worthless is inconsistent with a holding that the taxpayer could have deducted it currently during the years when the amounts were expended by it. Thus, the authorities clearly indicate that expenditures made with the *contemplation* that they will result in the creation of a capital asset cannot be deducted as ordinary and necessary business expenses even though that expectation is subsequently frustrated or defeated, as was the case here. We do not think that the case of *York v. Commissioner of Internal Revenue,* 261 F.2d 421 (4th Cir. 1958), is in conflict with this view.

There is more involved here than either a "technicality" or the mere effort to achieve administrative efficiency. It is true that a non-insurance taxpayer making the same type of expenditures would be able to take the same amount as a deduction for an ordinary loss under section 165 (footnote 5, *supra*) that it could not take as an ordinary and necessary business expense under section 162 *but* it could take the loss only in the year in which the project was abandoned. The timing of a deduction is of critical importance in the tax field—not only because of limitations questions, but also because of the need to identify the particular item with other tax incidents of each particular year. If we were to hold that section 162 permits this deduction, this interpretation would affect every taxpayer, not only insurance companies.

Of course, an interpretation of section 162 has especial significance in insurance taxation, because a holding that these are section 162 deductions would place them within those deductions under Phase I of the formula instead of their falling under Phase II. Such a holding would amount to an interpretation of this section as saying that expenditures made in contemplation of acquiring an identifiable capital asset must be held in suspense pending a final determination as to their success or failure and that if they result in failure, then they are deductible in the year in which they were incurred. Such a holding would, of course, be a precedent as to the meaning of section 162 in all cases.

Both logic and the strong policy supporting the idea that each tax year must so far as possible be considered as a taxing unit make it impossible for us to agree that the same kind of expenditures made by a taxpayer may not be deducted as ordinary and necessary business expenses if spent for a project that materializes, but would be so deductible if at some later time it was determined that the project should not be completed. We conclude that it is necessary to determine during the tax year in which they were made whether expenditures were or were not ordinary and neces-

---

6. This section provides: "Losses. General Rules.—There shall be allowed as a deduction any loss sustained during the taxable year . . [if]

    (c)(1) . . . incurred in a trade or business."

7. "If an expense is capital, it cannot be deducted as 'ordinary and necessary' . . . ." 397 U.S. at 575, 90 S.Ct. at 1305.

sary business expenses under section 162. We conclude that they were not, but that they were, instead, deductible as losses only in the year the projects were abandoned.[8]

The taxpayer further contends, however, that even if these amounts are not deductible as ordinary and necessary business expenses, they are nevertheless deductible as a part of Phase I investment income under the terms of section 804(c)(5) of the Code. The district court did not reach this question, since it held that taxpayer was entitled to deduct the amounts in question as expenses under section 804(c)(1). The Government has called attention in its brief to the fact that such a contention was not open to the taxpayer in the trial court because it failed to mention such alternative ground in its claim for refund in this case.[9] It is clear from a glance at the claim for refund that this theory of treatment of the expenditures was not stated as a "ground" for refund in the claim filed by the taxpayer. Moreover, the insurance company does not respond to the Government's contention in this regard. As stated by the Supreme Court in *Angelus Milling Co. v. Commissioner of Internal Revenue,* 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945):

> Petitioner's claim for recovering processing taxes paid by it was properly rejected by the Commissioner if it did not satisfy the conditions which Congress di-

rectly and through the rule-making power given to the Treasury laid down as a prerequisite for such refund. Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of Treasury officials. *Tucker v. Alexander,* 275 U.S. 228, 231–232, 48 S.Ct. 45, 72 L.Ed. 253; *United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 71, 53 S.Ct. 278, 77 L.Ed. 619; *United States v. Garbutt Oil Co.,* 302 U.S. 528, 533, 58 S.Ct. 320, 82 L.Ed. 405. Without needless elaboration, we conclude that there is nothing in what Congress has explicitly commanded to bar the claim. The effective administration of these modern complicated revenue measures inescapably leads Congress to authorize detailed administrative regulations by the Commissioner of Internal Revenue. He may insist upon full compliance with his regulations. See *United States v. Memphis Cotton Oil Co., supra,* 288 U.S. at 71, 53 S.Ct. 278; *Commissioner of Internal Revenue v. Lane-Wells Co.,* 321 U.S. 219, 223–224, 64 S.Ct. 511, 88 L.Ed. 684.

*Id.* at 295–296, 65 S.Ct. at 1164.

The only reference to the amount of these expenditures, totalling $67,088.00, is the following:

> Taxpayer's income was overstated by failure to take into account deductible investment expenses in the amount of $67,088.00.

---

**8.** We need not consider where the line must be drawn between treatment of disbursements made to others in connection with identifiable contemplated projects and those made as salaries to regular employees of the taxpayer in their day-to-day study and analysis of potential investments. We hold only that where, as the trial court found to be true here, such disbursements would be "capital" if they result in completion of a capital asset, they are likewise "capital" if they do not come to fruition. There may well be borderline cases, but here the taxpayer does not challenge the trial court's statement that: "There is no question but that, as the taxpayer apparently concedes, expenditures incurred in investigating investment opportunities which ultimately materialize must be treated as capital expenditures." Thus, we are dealing with expenditures that the trial court dealt with as being of a capital nature if the projects had been completed. In its brief here, the taxpayer does not challenge this basic

assumption, which the trial court said "taxpayer apparently concedes." Disbursements of other kinds which may, or may not be, properly classified as capital are not now before the court. They will be considered when and as their status for tax purposes in specific cases.

**9.** The applicable Treasury regulation on procedure and administration, § 301.6402–2(b) (26 CFR) provides, in pertinent part as follows:

No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The *claim* must set forth *in detail each ground* upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. . . . (emphasis added).

No contention was made, in the alternative, that if these expenditures were capital expenditures, they nevertheless should be allowed under Section 804(c)(5). As already stated, the taxpayer does not respond to the Government's contention that there was thus a complete failure to comply with the requirement of the regulations that "the claim must set forth in detail each ground upon which a credit . . . is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." The Court of Appeals for the Fifth Circuit recently found a similar failure to comply with this requirement. See *Southwestern Life Insurance Co. v. United States*, 560 F.2d 627 (5th Cir. 1977).

We conclude that the allowance of these expenditures in the computation of investment expenses under section 804(c)(1) was erroneous and that the trial court could not consider the alternative claim of the taxpayer that the deductions were allowable under section 804(c)(5) as trade or business deductions.

IV. Whether the district court erred in deciding that additional reserves maintained by taxpayer with respect to unexercised "guaranteed insurability" rider options on certain policies qualify as "life insurance reserves" under section 801(b) of the code.

In addition to selling ordinary life insurance policies, Union Mutual also sold policies which offered the policyholder an option to acquire specified additional amounts of insurance at specific future dates without having to present evidence of current insurability. Of course, such a policyholder, as is common with every other policyholder, would have furnished evidence of insurability at the time the basic policy was first issued. In return for the option, the policyholder is required to pay a surcharge on the basic premium for the insurance acquired, payable annually over the effective life of the option. The record discloses that this surcharge is designed to compensate the company for the risk that by the time such a "guaranteed insurability" option is actually exercised, the policyholder may have become an average or substandard risk.

The taxpayer here, of course, accumulated reserves out of the premiums paid for the basic policy. It also accumulated a reserve which represented a part of the surcharge, contending that such reserve was a "life insurance reserve" under the Code. As defined by section 801(b)(1), *supra*, life insurance reserves must be "computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest;" and section 801(b)(2), *supra*, provides that they must be "required by law." The applicable regulation further defines "reserves required by law" as

(b) . . . reserves which are required either by express statutory provisions or by rules and regulations of the insurance department of a State, Territory, or the District of Columbia when promulgated in the exercise of a power conferred by statute, and which are reported in the annual statement of the company and accepted by state regulatory authorities as held for the fulfillment of the claims of policyholders or beneficiaries.

Treas.Reg. § 1.801–5(b).

The United States contends that the additional reserves maintained by taxpayer with respect to unexercised "guaranteed insurability" rider options fail to qualify as "life insurance reserves" for several reasons. The first, we think, is not well taken. The Government contends that these reserves are not maintained with respect to life contingencies in existing policies of life insurance, but on contingencies on policies which might be issued in the future if and when the policyholder chooses to exercise his "guaranteed insurability" option. The Government fails to recognize that the option is one of the insurance protections afforded by the very insurance policy initially issued to the policyholder. The policyholder not only is given coverage for the face amount of his current policy but also is guaranteed the option to elect additional coverage at certain specified dates in the future. Thus, we do not think these re-

serves should fail to qualify on the asserted ground that they are not maintained with respect to existing policies. *See Mutual Benefit Insurance Co. v. Commissioner of Internal Revenue*, 488 F.2d 1101 (3d Cir. 1974).

The next basis of the Government's contention seems to be that these reserves are not allowable "life insurance reserves" because the record does not disclose that they are either needed to or actually serve the purpose of such a reserve. This argument is combined with an attack upon the lack of any basis in the record for the company's assumption that *all* policyholders would exercise the options guaranteed them under the basic policy. Of course, the amount of such reserves would be greater if 100% of the option-holders exercise the options than if only half or a quarter of them do.

The first part of this argument is premised upon the fact that the taxpayer issues ordinary life policies only to a "select" class of persons, *i. e.*, those applicants who have taken a physical examination. Life insurance reserves, however, are computed on the basis of mortality tables applicable to the entire population. Of course, the mortality experience for the insured class is demonstrably less than that from which the "ultimate" mortality tables are figured. The Government argues that computing the likelihood of paying death claims to members of the "select" group by applying mortality tables based upon the life expectancy of a "non-select" group enables the taxpayer to realize important mortality savings. There is no dispute that all insurance companies benefit from this built-in hedge against their obligations to satisfy future claims. When such mortality savings occur, as would always be the case if the actuarial computations are accurate, the insurance company is able to accumulate reserves in excess of the amount actually needed to meet the future contingencies. The accumulation ultimately inures to the benefit of the stockholders or other policyholders in a mutual company.

Because of this practice, the Government says that when the company, as here, agrees to issue policies at some future date to present policyholders, the reserves from the basic life premiums, being computed on the ultimate mortality tables, will be adequate to pay the losses incurred without creating any additional reserves. In other words, the Government seems to be saying that although it is appropriate for the companies to build in an excess increment of reserves for ordinary life insurance purposes, there is no demonstrable need for any additional reserves of the same kind where the company undertakes to issue future policies under which the losses are to be computed on the basis of ultimate mortality tables.

This contention of the Commissioner is that although the basic life insurance reserve formula followed by the industry creates an automatic "hedge" against imperfections in the work of the actuaries in computing mortality rates, there is no basis for providing a similar "hedge" by creating the additional reserves as to these policies. The government contends that by definition the company is guaranteeing only that it will issue policies without examination to persons whose expectancies when they exercise the options are precisely the same as those used in computing the mortality tables. The taxpayer counters, by stating, without record support, that there would be a tendency on the part of policyholders having such options who are in good health not to exercise the options and an equal tendency on the part of those who are in failing health to exercise them. This is what they speak of as the "anti-selection" principle. No evidence was introduced to support this theory.

While we do not accept the government's contention as being sufficient of itself to disallow the additional reserve, we recognize that it is more than a make-weight when considered in connection with the Commissioner's remaining two contentions: (1) that there is no basis for additional reserves computed on an assumption that 100 percent of the policyholders will exercise the option, and (2) that these additional reserves are not "required by law."

As to (1) the computation of life insurance reserves is ordinarily a simple matter. The formula is applied to every policyholder's payments based on actuarial tables. That is what the statute says: "computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest." § 801(b)(1), *supra*. Not so, here, however. No one knows how many of the holders of these "guaranteed insurability" policies will exercise the options 10 or 20 years after issue. The company assumed 100 percent exercise. It, of course, had the actual experience available to it. It could have readily ascertained the exact percent of such policyholders who had made the election to ask for increased coverage at the stated intervals. The company's witness stated that the company had made studies as to this figure but that, inexplicably to us, he was unable to state the exact percentage. In cross-examination he conceded that the "rate of exercise" "could be" 15, 20 or 25 percent. He also stated: "Oh, there's no doubt in my mind that it's less than 100 percent." While the trial court determined that this statute did not prevent consideration of other relevant factors in addition to the use of recognized mortality or morbidity tables and assumed rates of interest, it is difficult for us to give any meaning to this part of the statute if the taxpayer is permitted to write into the computation a factor as unsubstantiated as the company's assumption that it will be necessary to establish reserves for every possible contingency which any option-holder might elect to exercise at several future dates. This is especially true in view of the fact that the record demonstrates that the assumption is a false one. This case, thus, differs from *Mutual Benefit, supra*, since in that case the court permitted the introduction of factors which were based on the company's actual experience as to the percentage of policyholders who had exercised the optional method of payments that were there being considered. In short, we do not understand how reserves can be computed or estimated "on the basis of recognized mortality or morbidity tables" unless the dollar obligations that are being undertaken by the company are part of such computation or estimation. The computation made here totally fails to satisfy the requirements of § 801(b)(1)(A).

Finally, the Government contends that even if these reserves had been properly computed and met the other requirements of the statute, they do not meet the requirement that "life insurance reserves must be required by law." The taxpayer conceded that there was no express statutory provision or express rule or regulation of the insurance department of the State of Maine dealing with these reserves which had been promulgated in the exercise of a power conferred by statute. *See* Regulation § 1.801–5(b), *supra*.

Taxpayer contended, and the trial court held, that the state statute's broad requirement respecting the setting up of life insurance reserves, when construed by the insurance commissioner of the state (after this tax investigation began) as requiring this particular additional reserve, fully met the "required by law" term of the statute. We cannot agree.

Because of the differing interests of the Commissioner of Internal Revenue and the state commissioner in discharging their respective duties,[10] we conclude that the provision of the regulation defining "reserves required by law" as "reserves which are required either by express statutory provisions or by rules and regulations of the insurance department . . . when promulgated in the exercise of the power conferred by statute" means that they are required either by express statutory provisions of a state or by specific rules and regulations of the insurance department actually promulgated prior to the setting up of any additional reserves. We believe that

---

**10.** It is plain that state insurance commissioners serve to protect the interests of the insureds. One of the principal protections is the requirement that reserves be maintained in amounts adequate to meet future claims. The larger the reserves, the better the protection. The Commissioner of Internal Revenue, on the other hand, is concerned because every dollar of allowable reserves is a dollar less in income subject to tax.

Congress merely saw fit to permit state commissioners to affect the measure of taxable income with respect to reserves only to the extent that the state might take specific steps to require certain standards for the setting up of reserves. We do not believe that Congress intended to permit an insurance taxpayer to exclude any amount it saw fit from its taxable income by creating reserves and then leaving it up to the commissioner to take some positive action to require a reduction in the amount before the Internal Revenue Service could challenge the computation of the company's reserves.

Here, it is conceded that the Maine statute did not "expressly" authorize these reserves and that no rule or regulation of the commissioner promulgated as a state requirement specifically dealt with these additional reserves. We conclude, therefore, that these reserves were not "required by law" even if they had been otherwise authorized under the statute.

V.  Whether deferred and uncollected premiums may be taken into account as premiums received in computing "life insurance reserves" under section 801(b) of the code.

We quickly dispose of this issue without further discussion, because, as the Government concedes, the Supreme Court's decision in *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653, holds that the treatment accorded deferred and uncollected premiums by the taxpayer here was correct, and the trial court's decision in favor of the taxpayer on this issue must be affirmed.

VI.  Conclusion

In sum, therefore, we find that the judgment of the trial court should be affirmed as to Issue I, Issue II and Issue V but that the judgment must be reversed as to Issue III and Issue IV.

AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.