UNITED FIRE INSURANCE COMPANY, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 202–80.    Filed September 19, 1983.

*John L. Snyder* and *Sam DeFrank*, for the petitioner.
*Seymour I. Sherman*, for the respondent.

WILBUR, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1970 | $788.05 |
| 1971 | 2,476.09 |
| 1972 | 2,121,986.69 |

After concessions,[1] the sole issue for decision is whether petitioner qualified as a life insurance company under section 801(a)[2] during the years 1973, 1974, and 1975. The resolution of this issue turns on whether certain of petitioner's individual health and accident insurance policies, with respect to which petitioner valued mid-terminal reserves on the 2-year preliminary term basis, qualified as "noncancellable" or "guaranteed renewable" within the meaning of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference.

United Fire Insurance Co. (hereinafter referred to as petitioner) is a stock fire and casualty insurance corporation organized under New York law. Its principal place of business was Chicago, Ill., when the petition herein was filed. Petitioner

---

[1]Petitioner has conceded the deficiencies as determined for the years 1970 and 1971.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 and the Income Tax Regulations promulgated thereunder as amended and in effect during the years at issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.

filed its original Federal income tax returns for the calendar years 1970 through 1976 with the Internal Revenue Service Center at Kansas City, Mo. A copy of petitioner's annual convention statement (hereinafter referred to as the annual statement) was attached to each of its original returns.[3] After filing its original returns for 1970, 1971, and 1972, petitioner filed amended returns for each year and a second amended return for 1972, all with the Internal Revenue Service Center at Kansas City, Mo. At all times here pertinent, petitioner's primary and predominant business activity has been the issuance of policies or contracts of insurance and the reinsurance of risks underwritten by other insurance companies.

Prior to 1969, petitioner was a specialty insurer, writing exclusively policies covering risks of fire and extended coverage on weekly or industrial debit plans. In early 1969, petitioner adopted a policy of expansion and diversification under which it planned to enter into the accident and health insurance field. In 1968, pursuant to this plan, petitioner commenced, inter alia, to issue and reinsure individual policies of accident and health insurance.

During the years 1973 through 1975, a substantial portion of its business consisted of issuing and reinsuring policies of accident and health insurance. Most of the accident and health insurance policies issued or reinsured by petitioner contained a rider, clause, or provision which entitled the insured, at his option, to renew or continue the policy in force either for life or to a specified age of at least 60 years. All of these renewable policies were "level premium" policies; that is, the premium rate throughout the duration of each policy was required to be determined by reference to the age and underwriting classification[4] of the insured at the time the policy was first issued.

A small percentage of these policies guaranteed the insured the right to renew the policy at a specific, unadjustable

---

[3]The annual convention statement is an annual report which each insurance company is required to file on a calendar year basis with its State of incorporation and with every other State in which the company is engaged in the insurance business, as well as with, and as a part of, its Federal income tax returns. The forms on which such reports are made are devised by the National Association of Insurance Commissioners, of which the principal insurance administrator of every State is a member.

[4]Underwriting classification relates primarily to the occupation, health, and sex of the insured.

premium rate; in the terminology of the insurance industry, this type of policy is known as "noncancellable." Under most such policies, however, petitioner reserved the right to adjust the premium rates by policy class in accordance with its experience under the type of policy involved, to take into account such items as increased medical costs, but not changes in the age or underwriting classification of the insured. This type of policy is commonly known in the insurance industry as "guaranteed renewable."[5]

Noncancelable and guaranteed renewable accident and health policies are recognized product types in the insurance industry. For purposes of classification by the insurance industry, the contractual provisions described in the preceding paragraph distinguish noncancelable and guaranteed renewable individual accident and health policies from other forms of accident and health insurance. All of petitioner's individual noncancelable and guaranteed renewable policies satisfy the industry definition of that product type from the date those policies are issued, since the terms of those policies afford the insured the option to renew at level premiums until he or she reaches at least the age of 60.

The actuarial risks assumed by petitioner under its renewable policies increase with the age of the insured. Since petitioner may not adjust the premium rate to reflect these increased risks in the later years of such policies, the premium rate initially established represents, in effect, an actuarial average cost of insurance over the entire renewable period. During the early years of petitioner's renewable policies, the level premiums charged are therefore larger than the actuarially anticipated cost of claims for those years, and during the later years of such policies, the level premiums are insufficient to cover actuarially anticipated claims for those years.

Thus, in establishing the premium rate to be charged for its renewable policies, petitioner must include both the actuarial cost of insuring the policyholder for the current periodic premium term as well as the long-term risks, actuarially

---

[5]For the sake of convenience, petitioner's level premium renewable accident and health policies, including those renewable at an unadjustable rate, and those whose rate may be adjusted in accordance with petitioner's experience under the type of policy involved, will hereafter be referred to as "renewable" policies.

computed, represented by petitioner's promise to renew the policy at a level premium. In addition, petitioner must take into account the non-insurance costs associated with these policies in establishing the premium rate to be charged. In insurance industry parlance, the total premium charged for a policy of insurance (the "gross premium") thus consists of two computational factors: the "net premium" and "loading." The net premium is the actuarially computed amount of the gross premium designed to cover the cost of the insurance risk under the policy. Loading is the portion of the gross premium designed to cover petitioner's non-insurance costs, such as commissions and administrative expenses, and also includes a margin for profit.

The insurance industry is regulated by State authority. One of the primary objectives of such State regulatory authority is to assure that companies falling within their jurisdiction are able to meet claims of policyholders as they fall due. In furtherance of this objective, such authorities establish minimum reserve requirements which insurance companies must comply with, and require such companies which engage in the insurance business in the State to file an annual statement reflecting such reserves.

One type of reserve here pertinent that State regulatory authority requires petitioner to establish with respect to its renewable policies is the "active life reserve," which is a reserve maintained for claims which have not yet been incurred. The active life reserve consists of two components, carried and stated separately in the annual statement used by petitioner. The first component of the active life reserve is the "unearned premium reserve." The second component of the active life reserve is the "additional reserve."

The unearned premium reserve is established on the annual statement date (i.e., December 31) to provide for claims and benefits which may be incurred during the remainder of the current policy term. That is, an insurer will generally have received premium payments during a year on policies for periods extending beyond the annual statement date. Such premiums will therefore not be fully earned by the company on December 31. The unearned premium reserve covers the period beyond the annual statement date and expires (with

respect to any particular policy) on the last day of the policy term.

Subject to certain allowable assumptions, the dollar amount of the unearned premium reserve for a particular class of policies represents the pro rata amount of either the gross or net premiums received with respect to that class which has not been earned by the company as of the annual statement date. Thus, if a company issues a policy on July 1 for a premium of $100, the gross pro rata unearned premium with respect to that policy as of December 31 will be $50.[6] The unearned premium reserve diminishes as a function of the mere passage of time as the premiums are earned by the company, and at the end of a policy year, the amount contained in the reserve for a class of policies is reduced to zero. Although the company will be required to carry an unearned premium reserve on the next following annual statement date with respect to policies that are renewed, the unearned premium with respect to any given year does not accumulate, but expires at the end of the policy year.

Additional reserves, the second component of the active life reserve, on the other hand, are intended to cover claims and benefits which will arise after the end of the current periodic premium period. The purpose of the additional reserve is to supplement premiums received in the later years' of level premium policies when actuarially estimated claim costs will exceed net premiums received in those years.

Under applicable State regulatory provisions, a permissible form or basis for the unearned premium reserve is the gross pro rata unearned premium, and a permissible form or basis for the additional reserve is the mid-terminal reserve. Permissible methods of computing the additional or mid-terminal reserve, under pertinent State regulatory authority, include both the "net level method" and the "preliminary term method." Under the latter method, a preliminary term of 2 years is permissible.

At all times pertinent herein, petitioner utilized the gross pro rata unearned premium basis for computing its unearned premium reserve with respect to its renewable policies and

---

[6]The distinction between gross and net unearned premiums will be discussed *infra*.

utilized the mid-terminal basis for its additional reserve with respect to such policies. Petitioner computed its additional (mid-terminal) reserves under the 2-year preliminary term method with respect to its renewable policies.

The gross pro rata unearned premium includes both the loading factor and the cost of carrying the insurance risk for the unexpired term of the current premium period. The net unearned premium is the portion of the premium attributable to the unexpired term of the premium period which covers the cost of carrying the insurance risk. The gross pro rata unearned premium reserve as reflected on petitioner's annual statement, subject to certain permissible assumptions,[7] included that portion of the gross premium paid on its renewable accident and health policies in force, proportionate to the unexpired portion of the current term of such policies, regardless of the length of time the policies had been in force.

Conversely, the additional reserve is intended to cover claims and benefits which will arise after the end of the current premium-paying period. The additional reserve arises from petitioner's long-term obligation to renew its policies. This reserve is the measurement of petitioner's liability for future contingent claims—those not yet incurred under its individual policies—and is equal to the present value of future benefits payable under those policies minus the present value of future net level premiums receivable.

When the additional reserve is actually computed at the end of a completed policy year on a group of policies that all renew on the same date, it is referred to as the "terminal reserve." However, the mid-terminal reserve is often utilized since policies are normally issued on various dates over the course of a particular calendar year, and it is generally impracticable to compute precise terminal reserves. The mid-terminal reserve is simply an average of two terminal reserves which is computed by assuming the issue dates of all policies in a particular class to be evenly distributed over the calendar year. The effect of using mid-terminal reserves is that all

---

[7]In computing its gross unearned premium reserve, petitioner utilized a common procedure called the "half-month convention." Under this convention, petitioner assumed, for convenience, that all policies issued in a given month were issued on the 15th day of the month. This convention is acceptable to relevant State regulatory authorities.

policies are treated as having been issued on July 1 of the calendar year so that, on the annual statement date (i.e., December 31), the actuarially computed reserves fall exactly halfway between two successive terminal reserve values.

Under the net level method of valuing mid-terminal reserve for a class of policies, the dollar amount of the reserve is arrived at by calculating the excess of the present value of future benefits payable under policies within the class over the present value of future net valuation premiums under such policies. Under this method, the above computation must be made with respect to all policies in force on the valuation date, irrespective of the length of time the policies have been in existence. To the extent that the present value of future benefits payable· exceed the present value of future net valuation premiums, funds must be retained out of premiums and accumulated at the relevant assumed rate of interest in the mid-terminal reserve.

The 2-year preliminary term method of computing reserves is a recognized and accepted actuarial method, and has been accepted and approved by the National Association of Insurance Commissioners and by the pertinent regulatory agencies of those States in which petitioner does business. It is the method most commonly used for valuing reserves on individual noncancelable and guaranteed renewable accident and health policies. At all times here pertinent, petitioner computed the mid-terminal reserves on its renewable policies on the 2-year preliminary term basis, using appropriate valuation tables and based on recognized mortality and morbidity tables and an assumed rate of interest at 3 percent.

The preliminary term method of valuation recognizes that an insurer's administrative expenses in the first years of a policy are much higher than those in renewal years, and that, conversely, claims costs will increase with age. Thus, for 2 policy years or even longer, the insurer may have a substantial unliquidated initial expense before setting up reserves. For these reasons, the recommendation of the NAIC Task Force 4, and of the NAIC Industry Advisory Committee on Reserves for Individual Health Insurance Policies, provides for a preliminary period of 2 years as the minimum reserve basis for individual accident and health policies.

Under the 2-year preliminary term method of valuing mid-terminal reserves, the dollar amount of the reserve is the excess of the present value of future benefits over the present value of future net valuation premiums on all of petitioner's renewable policies which have been in force for more than 2 years as of the annual statement date, but does not include any amount representing the excess of the present value of future benefits over the present value of future net valuation premiums on those renewable policies which have been in force for less than 2 years. At the end of the preliminary term (i.e., when a policy enters its third year), the excess of the future benefits over the future net valuation premiums on such policy then becomes part of the mid-terminal reserve. Such amount is computed as though the policy had been issued 2 years after its actual date of issue to a person 2 years older than the age of the insured at the actual issue date of the policy (and therefore at a higher rate), and as though the net level method was then being used.

For example, if an insured purchased a policy in 1971 at the age of 30, petitioner would have added zero with respect to such policy to the mid-terminal reserves computed as of December 31, 1971, and December 31, 1972. Commencing with the December 31, 1973, valuation date (assuming renewal), petitioner would have added to the mid-terminal reserves that amount (not less than zero) which would have been required on a net level reserve basis had the policy been issued in 1973 to the insured at the age of 32. In this manner, the preliminary term method accumulates reserves at a faster rate than the net level method after the expiration of the preliminary term and ultimately results in the same established reserve as the net level method at or by the end of the full policy term.

Petitioner, on the recommendation of its actuary and in accordance with State law, determined the adequacy of its reserves on the basis of its long-term liability with respect to all its policies. The use of the preliminary term method permitted petitioner to compute a reserve of zero for those policies in force less than 2 years. However, beginning in the third year of the policy, the increase in the reserve computations are greater under the preliminary term method than under the net level method. Over time, the reserves accumulated under either method are comparable, and regardless of

which method is employed, reserves must be adequate in view of the liabilities on all of petitioner's renewable policies—including policies over and under 2 years of age.

While the reserve is mechanically developed by applying unit reserve factors to unit benefits of single policies, separate reserves are not held on single policies. Rather, the additional reserve is an aggregate reserve, and has actuarial meaning only with respect to an entire group of policies. Mortality and morbidity tables are used in the calculation of unit reserve values, and such tables assume that a large population of policy holders are expected to die or become ill according to certain yearly rates. The additional reserves are an aggregate amount which, together with future net premiums, will meet the benefit payments arising from the group policies valued as such benefits accrue in the future. The application of a formula for the calculation of such reserves to an individual policy (or small group of policies) does not produce a meaningful result, since few policyholders will experience average morbidity. The New York Minimum Valuation Standard was based on this concept of the aggregate nature of reserving as described in the 1964 report of the Industry Advisory Committee on Reserves for Individual Health Insurance Policies.

There are no differences in the terms and provisions of petitioner's renewable policies, or in the nature of its obligations thereunder, based on how long the policies have been in force. Specifically, with respect to the obligation to renew, petitioner is contractually bound to precisely the same extent under a renewable policy that has been in force for 2 years or less, as it is under a similar policy in force for a longer period.

Petitioner's exposure to long-term morbidity risks under its renewable policies was the same with respect to policies in force for 2 years. Both its policies of less than 2 years' duration and its policies over 2 years' duration carried long-term morbidity risks, based on one and the same provision obligating the company to renew.

Respondent determined (a) that petitioner's use of the 2-year preliminary term method of valuing mid-terminal reserves precluded petitioner's renewable policies from being classified as noncancelable or guaranteed renewable policies for Federal tax purposes for the first 2 years the policies were in force.

As a result, respondent determined (b) that petitioner did not qualify as a life insurance company for the years 1973 through 1976 within the meaning of section 801(a), since, with the unearned premiums and unpaid losses on such policies for the first 2 years of their lives excluded from the total of such amounts computed under section 801(a)(2), such remaining amounts, plus its life insurance reserves, were less than 50 percent of petitioner's total reserves, as required by section 801(a).

As a further result, respondent then determined (c) that the remaining balance in petitioner's policyholders' surplus account at the end of 1972 should be added back to its taxable income as reported for that year, pursuant to the provisions of sections 802(b) and 815(d)(2).

After the allowance of an additional deduction, not claimed in petitioner's 1972 return and not here in dispute, the present contested deficiency resulted.[8]

In its petition, petitioner disputes respondent's first determination, and contends (a) that its renewable accident and health policies qualified as noncancelable or guaranteed renewable policies for Federal tax purposes for all policy years, in spite of its use of the 2-year preliminary term method of reserving.

From this, petitioner contends (b) that it meets the over-50-percent test of section 801(a) with respect to its reserves for the years 1973–76, and is therefore a life insurance company within the meaning of that section during those years.

Petitioner therefore contends (c) that respondent's action in adding back the balance of its policyholders' surplus account at December 31, 1972, to its taxable income for that year was erroneous, and that the deficiency determined thereby was incorrect.

Petitioner further contends that it overpaid its income tax for the year 1972 because of (d) the additional deduction for the year 1972 which it failed to claim in its return, but which respondent allowed in his statutory notice, and (e) that it had a net operating loss for the year 1975 in the amount of $184,238,

---

[8]If the Court sustains respondent as to determination (a), petitioner concedes that respondent's determinations (b) and (c) are correct.

which it is entitled to carry back to the year 1972 and which will produce a further overpayment of tax in that year.[9]

OPINION

This is a companion case to *National States Insurance Co. v. Commissioner*, 81 T.C. 325 (1983) (Court reviewed), also decided by the Court today. Both are cases of first impression presenting precisely the same issue on virtually identical facts. As in *National States Insurance Co.*, we are asked to determine whether the petitioner is a life insurance company within the meaning of section 801. Section 801 provides the following definition of a life insurance company:

SEC. 801(a). LIFE INSURANCE COMPANY DEFINED.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—
    (1) its life insurance reserves (as defined in subsection (b)), plus
    (2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

Section 801(e) provides that "guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance."

Accordingly, petitioner will qualify as a life insurance company if its life insurance reserves, plus unearned premiums and unpaid losses on its renewable policies, exceed 50 percent of its total reserve (hereafter the reserve ratio test). The total reserves, as defined in section 801(c), include life insurance reserves, unearned premiums and unpaid losses not included in life insurance reserves, and all other reserves required by law. In the case of noncancelable and guaranteed renewable health and accident insurance policies, unearned premiums and unpaid losses are inserted in both the numerator and the denominator of this fraction—both above and

---

[9]If the Court sustains petitioner as to its point (a) *supra*, respondent concedes that petitioner is correct with respect to points (b), (c), (d), and (e).

below the line. If that is done in this case, it is conceded that petitioner easily qualifies as a life insurance company. Respondent contends that unearned premiums and unpaid losses are includable only in the denominator because petitioner's policies are not noncancelable or guaranteed renewable. Respondent concedes that petitioner's policies meet the industry definition of noncancelable or guaranteed renewable policies, but argues they are not noncancelable or guaranteed renewable within the meaning of the Federal income tax regulations. Sections 1.801–3(c) and 1.801–3(d) of the regulations provide the definitions of noncancelable and guaranteed renewable policies:

(c) *Noncancellable life, health, or accident insurance policy.* The term "noncancellable * * * policy" means a * * * contract * * * which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums * * * must be carried to cover that obligation. * * *

(d) *Guaranteed renewable life, health, and accident insurance policy.* The term "guaranteed renewable * * * policy" means a * * * contract * * * which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes * * * , and with respect to which a reserve in addition to the unearned premiums * * * must be carried to cover that obligation. * * *

In *National States Insurance Co. v. Commissioner, supra,* we examined the relevant committee reports from which these regulations were taken almost verbatim. We concluded that the committee reports (and the regulations) identify level premium contracts with long-term obligations that by their nature require reserves and were not intended to specify a particular reserving mechanism. We carefully examined the legislative history of the 1942 Revenue Act, since Congress in that act expanded the definition of a life insurance company to include noncancelable contracts of health and accident insurance, subsequently adding a provision (sec. 801(e) *supra*) requiring that guaranteed renewable contracts of health and accident insurance receive identical treatment. In referring to the "types" of contracts it was covering, Congress made the following statement:

Since noncancelable contracts of health and accident insurance *require the accumulation of substantial reserves against increased future risks*, the writing of such insurance is *analogous to life insurance* and the definition has been changed to permit such companies to be taxed as life insurance

companies. [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 611–612. Emphasis added.][10]

What we said in *National States Insurance Co.*, bears repeating here:

Congress included noncancelable contracts of health and accident insurance because they "require the accumulation of substantial reserves against future risks" and therefore the writing of such insurance is "analogous to life insurance." Petitioner's policies require "the accumulation of substantial reserves against future risks," and these risks commence on the date the policy is issued. Both of these characteristics make petitioner's policies "analogous to life insurance" in the specific sense Congress used those words.

Respondent recognizes the long-term risks involved, but argues that the preliminary term method is defective because reserves are not actually computed under this method during the first 2 years. However, this hardly creates a marked difference from life insurance contracts. The preliminary term method had its origin in, and is used extensively in, the life insurance field, and the use of the preliminary term method is clearly compatible with a policy's status as life insurance. Congress identified the long-term risks necessitating reserves as the characteristic that is "analogous to life insurance," and the preliminary term method has long been extensively used in reserving life insurance policies against those long-term risks. Since this method has been used without any adverse tax consequences to the life insurance status of those policies, the disparity respondent introduces here is at war with the legislative history. Indeed, the analogy to life insurance is enhanced, not diminished by the use of the preliminary term method. In identifying the "types of insurance" it intended to include as "analogous to life insurance," Congress focused not on a particular reserving mechanism, but on the necessity for reserves arising from long-term risks. [*National States Insurance Co. v. Commissioner*, 81 T.C. 325, 337–338 (1983).]

In the legislative history of the 1942 Act, Congress, in discussing the "types" of insurance contracts it had in mind, also stated:

*As the term is used in the industry,* a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation. * * * [S.

---

[10] When Congress required guaranteed renewable policies to be treated the same as noncancelable health policies, it again referred to the "type" of insurance contracts it had in mind:

" *The type* of insurance contracts referred to are life, health, and accident policies which are not cancelable by the company but under which the insurance company reserves the right to adjust premium rates by classes, in accordance with experience under the type of policy involved. [S. Rept. 291, 86th Cong., 2d Sess. (1959), 1959–2 C.B. 770, 793. (Emphasis added.) See also H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 748.]"

Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 612. Emphasis added.]

Again our comments in *National States Insurance Co.* bear repeating here:

Congress focused on, and adopted, the definition of a noncancellable insurance policy "as the term is used in the industry." Indeed, Congress specifically stated that "*As the term is used in the industry*, a noncancellable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation." S. Rept. 1631, *supra*, 1942–2 C.B. at 612 (emphasis added). See also H. Rept. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 372, 454 (using virtually identical language). This definition, which is the same today as when Congress adopted it, applies to GRHA policies with modifications not relevant to the present controversy. We think this is significant (cf. *Alinco Life Ins. Co. v. United States*, 178 Ct. Cl. 813, 373 F.2d 336, 353 (1967)), for the parties have stipulated and we have found that all of petitioner's GRHA policies satisfy the industry definition.

The language of the disputed regulation is taken almost verbatim from the 1942 committee reports set out above. It is difficult to see how respondent can stipulate that petitioner's policies meet the industry definition of a guaranteed renewable contract and at the same time contend that the language of the committee report (as incorporated in the regulations) precludes petitioner from qualifying. We believe the language of the committee report makes it clear that Congress intended to identify a product "type," and employed the term noncancelable (and guaranteed renewable) "as that term is used in the industry." The regulation, lifted virtually verbatim from the committee reports, must be interpreted accordingly. [*National States Insurance Co. v. Commissioner, supra* at 338–340.]

There are other reasons for deciding this issue for petitioner that are more fully set out in *National States Insurance Co. v. Commissioner, supra,* and need not be repeated here. It is fair to say that in both cases we have relied heavily on the legislative history of the 1942 Act from which the regulations in issue were taken virtually verbatim.[11]

---

[11]We remain unpersuaded that some vague purpose underlying the reserve ratio test eclipses this legislative history. We are concerned here with the nature of petitioner's policies. This issue must be decided prior to, and apart from, the application of the reserve ratio test, since if they qualify as life, annuity, or noncancelable health insurance contracts, the reserves *and* unearned premiums will go in both the numerator and the denominator. Additionally, the reserve ratio test is not designed to determine the nature of a particular insurance *policy*, but the nature of an entire *company*. (Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 3, 85 (1921). (Statement of T. S. Adams.)) When a company combines the sale of life insurance with casualty insurance, the reserve ratio test was enacted to determine which predominated. Put differently, when two types of

Accordingly, we hold that petitioner's renewable policies were "noncancellable" and "guaranteed renewable" within the meaning of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Petitioner thus qualified as a "life insurance company" under section 801 during the years in issue.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

KÖRNER, *Judge,* dissenting: I respectfully dissent. The issue presented for our decision in this case is whether petitioner's accident and health policies which were in force 2 years or less, and with respect to which petitioner valued mid-terminal reserves on the 2-year preliminary term basis, qualified as "noncancellable" or "guaranteed renewable" accident and health policies for Federal tax purposes.

In resolving this issue, we are not provided with statutory guidance since the Internal Revenue Code nowhere defines the terms "noncancellable" or "guaranteed renewable" accident and health policies. Sections 1.801–3(c) and 1.803–3(d), Income Tax Regs., do define these terms, however, and we are thus called upon to interpret these regulations.

The specific terms of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., provide, inter alia, that, in order for a policy of accident and health insurance to be classified as "noncancellable" or "guaranteed renewable" for Federal tax purposes, it must be one which the issuing company is under an obligation to renew at a specified premium (in the case of noncancelable policies) or at a premium rate which can be adjusted by class according to experience (in the case of guaranteed renewable) *and* with respect to which a reserve in addition to unearned premiums must be carried to cover the

---

insurance of an entirely different character are sold by one company, the reserve ratio test was developed to determine the proportion of each character making up the whole, but not to change the character of the component parts. The reserve ratio test was designed to tell us what the character of the *company* is—life insurance or otherwise—but not what the character of a contract is—cancelable or noncancelable. Clearly the policies before us involve long-term risks that Congress said are analogous to life insurance.

obligation to renew. Thus, under the regulations, an insurance company must assume a long-term risk *and* be required to carry a reserve to cover that risk with respect to each policy which it seeks to classify as noncancelable or guaranteed renewable for Federal tax purposes.

There is no question that the policies under consideration are policies which the issuing company is under an obligation to renew at a specified premium or at a premium that can be adjusted only by class according to experience, and respondent does not contend otherwise. The focus of our inquiry is whether the "reserve" requirement imposed by the regulations is satisfied during the first 2 years of the policies' existence under the 2-year preliminary term method of reserving as employed by petitioner. That is, can petitioner's accident and health policies 2 years or less in force legitimately be considered to be policies "with respect to which a reserve in addition to unearned premiums must be carried" to cover petitioner's obligation to renew?

The majority answers the above question in the affirmative. In reaching this conclusion, the majority appears to rely upon two separate theories. First and primarily, it seems to feel that the sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., were meant to generally define those accident and health insurance policies which are long-term policies for which the issuing company may be required to establish reserves *at some time*. Under this interpretation, whether petitioner was required to actually establish reserves with respect to its policies during their first 2 years of existence thus becomes irrelevant since the policies in issue are clearly long-term policies which, by their nature, may require petitioner to begin to accumulate reserves *at some future time*. Second, the majority appears to have accepted petitioner's argument that the reserves which petitioner has actually established during the years in issue are to be considered to be maintained "with respect to" accident and health policies in force 2 years or less within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., even though such policies in no way contribute computationally to such reserves. Under this reasoning, the "additional reserve" requirement of the regulations is, according to the majority, satisfied with respect to all of petitioner's

renewable accident and health policies from the date of issuance.

I do not think that either of the above two theories represents an adequate basis for the majority's resolution of the issue presented in this case. In my opinion, the definitional regulations may only legitimately be read to require a "reserve in addition to unearned premiums" to be actually carried (i.e., computed and set aside) with respect to each policy, for each and every year the taxpayer seeks to classify a particular policy as noncancelable or guaranteed renewable for Federal tax purposes. It is my further belief that petitioner's accident and health policies in force 2 years or less failed to meet these definitional standards under the 2-year preliminary term method employed by petitioner. The reasons for my respective conclusions are set out in the following subsections.

## I. The Requirement of an Additional Reserve— Its Genesis and Rationale

A company which qualifies as a "life insurance company" under section 801(a)[1] receives a preferred Federal tax status relative to that of other insurance companies and corporations. The question presented in the present case—i.e., whether petitioner's accident and health policies 2 years or less in force qualified as noncancelable or guaranteed renewable policies for Federal tax purposes—is important only because its resolution will determine whether petitioner was qualified to receive the preferred tax status afforded to "life insurance companies." The proper interpretation of the regulations that define "noncancellable" and "guaranteed renewable" accident and health policies must therefore be made in light of considerations that prompted Congress to afford favorable Federal tax treatment to "life insurance companies." Otherwise, we risk employing an interpretation which would cause the regulations to fail to harmonize with the premise that underlies the statute they purport to interpret. Such a reading must clearly be avoided. See, e.g., *Maximov v. United States*, 373 U.S. 49 (1963); *Burnet v. Guggenheim*, 288 U.S. 280 (1933).

---

[1] All section references herein are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise expressly indicated.

The unique system of Federal income taxation of life insurance companies had its genesis in the Revenue Act of 1921[2] (hereinafter the 1921 Act). Prior to 1921, life insurance companies had been taxed under a system comparable to other corporations in that all of the income of such companies, including income derived from investments, as well as premium receipts, was subject to tax.[3] However, due to the peculiar nature of the life insurance business, fundamental inequities were perceived to flow from the application of general corporate taxation rules to life insurance companies.[4] In particular, it was pointed out to Congress that the application of standard tax accounting conventions which, in end result, offset current expenses against current receipts and thereby arrive at the "taxable income" of a business for a particular year, could prove to be an inadequate measure of the annual income of companies issuing long-term life insurance policies. This is because companies issuing such policies assume long-term actuarial risk *and* are required by State law to set aside current receipts or other assets in reserves to cover those risks. When a company is required to set aside current receipts in reserve to pay future claims under a policy, such receipts are not currently available for general corporate purposes, or for distribution to shareholders. As such, amounts required to be reserved by a life insurance company are, in the words of the Supreme Court "not true income, but analogous to permanent captial investment." (Fn. ref. omitted.) *Helvering v. Oregon Mutual Life Insurance Co.*, 311 U.S. 267, 269 (1940). See also *National Life Insurance Co. v. United States*, 277 U.S. 508 (1928); *Economy Finance Corp. v. United States*, 501 F.2d 466, 481 (7th Cir. 1974), cert. denied 420 U.S. 947 (1975); *Group Life & Health Insurance Co. v. United States*, 434 F.2d 115, 117 (5th Cir. 1970), cert. denied 402 U.S. 944 (1971; *Alinco Life Insurance Co. v. United States*, 178 Ct. Cl. 813, 373 F.2d 336 (1967).

---

[2]Ch. 136, secs. 242–247, 42 Stat. 227, 261–264 (1921).

[3]A special deduction was allowed for certain additions to net reserve funds. See generally 1 T. Nash, Federal Income Taxation of Life Insurance Companies, sec. 5 (1982).

[4]See, e.g., Testimony of T. S. Adams, Senate Hearings on H.R. 8245, 67th Cong., 1st Sess. 83 (1921).

This characterization of the life insurance business led Congress to conclude that "life insurance companies" should be taxed differently from other corporations. In enacting corrective measures, however, Congress did not choose to adopt statutory provisions which ferret out each portion of an insurance company's gross receipts which were not the proper subject for current taxation. Instead, extremely broad standards were adopted. Under the 1921 Act, "life insurance companies" were allowed to exclude 100 percent of annual premium receipts from gross income.[5] Significantly, however, those companies which were to be afforded this preferential tax status were defined by reference to the qualitative nature of their reserves. Thus, only a "life insurance company" was to be afforded the above-noted beneficial tax treatment and such a company was defined in the 1921 Act as:

an insurance company engaged in the business of issuing life insurance and annuity contracts * * * the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.[6]

The expressed goal of the above reserve ratio test was to distinguish between those companies whose predominate business for *any given year* was the issuance of "life insurance" from those companies whose predominate business for any given year was the issuance of accident and health insurance. As explained by T. S. Adams, then tax adviser to the Treasury, the rationale underlying the 50-percent life insurance qualification formula was as follows:

Some companies mix with their life business accident and health insurance. It is not practicable for all companies to disassociate those businesses so that we have assumed that if the accident and health business was more than 50 percent of their business, as measured by their reserves, it could not be treated as a life insurance company. On the other hand, if their accident and

---

[5]See sec. 244(a) of the 1921 Act. This approach to the taxation of "life insurance companies" was modified by the Life Insurance Income Tax Act of 1959. See Pub. L. 86–69, 73 Stat. 112 (applicable retroactively to taxable years beginning after Dec. 31, 1957). Under the 1959 Act, "life insurance companies" are effectively entitled to exclude only one-half of their underwriting income from current taxation. See secs. 802(b)(3), 815(d)(2).

[6]See sec. 242 of the 1921 Act. 42 Stat. 227, 261.

health insurance were incidental and represented less than 50 percent of their business we treated them as life insurance companies.[7]

 The distinction between predominately life companies and predominately accident and health companies was necessary under the statutory scheme because, in 1921, accident and health policies were essentially short-term policies, and current premium receipts were therefore treated as entirely earned by the issuing company at the end of the current periodic premium-paying period. As such, premiums received with respect to such policies were not required to be segregated into long-term reserves, and companies whose predominate business, as measured by their reserves, consisted of the issuance of such policies should not, in Congress' view, be entitled to exclude annual premium receipts from current taxable income. That is, the "true income" of such a company could be adequately measured annually by invoking standard tax accounting conventions, since no long-term reserve requirement accompanied such policies.

As the insurance industry evolved after 1921, the accident and health business sold by life-type companies began to vary and expand considerably.[8] Such companies began writing accident and health policies which were renewable at the option of the insured at a level, unadjustable premium rate over a long period of time. Later, such companies developed an analogous long-term accident and health policy whose premium rate could be adjusted by class in accordance with the issuing company's experience under the policy, but could not be adjusted due to the increased age and underwriting status of the insured. Since both of these types of long-term accident and health policies impose actuarial risks upon the issuing company which will not be sufficiently offset by premium receipts in the later years of the policies, Congress perceived that a certain percentage of current premiums received with respect to such policies would be required to be segregated into long-term reserves to cover such risks. When the predominate

---

[7]Hearings on H.R. 8245 Before the Senate Comm. on Finance, 67th Cong., 1st Sess. 85 (1921).

[8]See G. Lenrow, R. Milo & A. Rua, Federal Income Taxation of Life Insurance Companies, ch. 9 (3d ed. 1979).

business of a company *for any given year* was of a nature which required the company to treat a significant percentage of current premium receipts as unearned (i.e., to establish long-term reserves with respect thereto), Congress concluded that such companies should be afforded the same preferential tax treatment as "life insurance companies."

When Congress expanded the definition of a "life insurance company" in 1942 and 1959[9] to include those companies predominately issuing "noncancellable" and "guaranteed renewable" accident and health policies, respectively, the need to establish long-term reserves against increased future risks with respect to such policies was thus explicitly recognized as justifying the expansion. In fact, the legislative history indicates that Congress considered the *sole* reason those policies should be treated as "life insurance policies" for purposes of the reserve ratio test of section 801 was because a long-term reserve was perceived as required with respect to such policies. Thus, in its report on the 1942 Act, the Senate Finance Committee stated:[10]

*Since* noncancelable contracts of health and accident insurance *require the accumulation of substantial reserves against increased future risks,* the writing of such insurance is *analogous to life insurance* and the definition has been changed to permit such companies to be taxed as life insurance companies. * * * As the term is used in the industry, a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium *and with respect to which a reserve in addition to unearned premiums must be carried to cover the renewal obligation.* [Emphasis supplied.]

In light of the above-outlined history of taxation of life insurance companies and, in particular, the Senate report quoted immediately above, I find that I must take issue with the majority's primary conclusion that, for purposes of resolving the issue before us, the reserves arise from, rather than define, the nature of the contract. Quite to the contrary, it is apparent that the sole reason Congress considered itself justified in expanding the definition of a "life insurance company" to include companies predominately issuing non-

---

[9]See ch. 619, 56 Stat. 798 (1942); sec. 201(b), sec. 801(e), I.R.C. 1954.

[10]S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. at 611-612. See also S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770, 793, in relevant part.

cancelable and guaranteed renewable accident and health policies was because such policies "require the accumulation of substantial reserves." For purposes of determining the *Federal tax classification* of such a policy, therefore, the reserve does in fact define the contract. The mere fact that a policy of accident and health insurance is a long-term policy was not intended to be the determining factor in classifying the policy for Federal tax purposes.

Sections 1.801–3(c) and 1.801–3(d) of the regulations recognize this fundamental fact. Under these regulations, a policy of accident and health insurance will only qualify as noncancelable or guaranteed renewable for Federal tax purposes if it is one which the issuing company is under an obligation to renew for a specified period and with respect to which a reserve in addition to unearned premiums *must be carried* to cover *that obligation to renew*. Moreover, since the Federal tax classification of an insurance company must be made on an *annual* basis, it seems fundamental to me that the specific definitional requirements of policies which are to contribute to a company's classification as a "life insurance company" must also be satisfied for each and every year the preferred classification is sought. Although a policy may be a level premium policy which the company is under an obligation to renew, unless the company is required to *currently* establish long-term reserves to cover *its obligation to renew* the policy is simply not the type of policy which Congress intended to contribute to a company's *current* classification as a "life insurance company."

Any other reading of these regulations, in my opinion, would not be in keeping with the premise underlying the expansion of the definition of a "life insurance company" to include those companies issuing predominately "noncancellable" or "guaranteed renewable" accident and health policies.

The long-term liability to renew under a level premium accident and health policy may exist from the date the policy is first issued. However, such a liability can in no way be considered an "accrued" liability, since the time and amount of ultimate payment under the policy depends upon *future* events. The reserve quantifies this otherwise unquantifiable obligation through implementation of actuarial theory and requires the segregation of assets which would otherwise

remain available for general corporate use. Until the company takes that reserving step with respect to premiums received on a particular policy, the above-cited legislative history indicates that the policy is not the type of policy that was intended to contribute positively to a company's "life insurance company" status.

I would therefore read sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., to require a long-term reserve to be actually established (i.e., computed and set aside) to cover the company's obligation to renew a policy before that policy is to be classified as noncancelable or guaranteed renewable for Federal tax purposes. Cf. *Economy Finance Corp. v. United States*, *supra* at 482, where the Seventh Circuit Court of Appeals cited with approval a Revenue Ruling (Rev. Rul. 71–367, 1971–2 C.B. 258), which adopts this interpretation.

## II. Do Petitioner's Policies Qualify?

### A. OPERATION OF THE 2-YEAR PRELIMINARY TERM METHOD

I would thus read sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., to require that a long-term reserve be currently maintained with respect to a policy of accident and health insurance before that policy will be classified as noncancelable or guaranteed renewable for Federal tax purposes. Were these definitional requisites met by petitioner's policies 2 years or less in force under the 2-year preliminary term method of reserving employed by petitioner? A close examination of the operation of the 2-year preliminary term method leads me to conclude that the answer to this question must be in the negative.

As already stated, the policies in dispute in this case were clearly long-term policies which were renewable at the option of the insured at a level premium. Thus, in establishing the premium rate to be charged for its renewable policies, it was necessary that petitioner include both the actuarial cost of insuring the policyholder for the current period premium term as well as the cost of the long-term risks, actuarially computed, represented by petitioner's promise to renew the policy at a level premium. This latter amount (i.e., the amount petitioner charged which was allocable to its obligation to renew) is quite clearly that amount which Congress contem-

plated to be required to be set aside as a "reserve in addition to unearned premiums" before a policy would be classified as noncancelable or guaranteed renewable for Federal tax purposes. As the relevant Senate report states, "reserves in addition to unearned premiums" are:

those amounts which must be reserved * * * , to provide for the additional cost of carrying [noncancelable policies] in later years when the insured will be older and subject to greater risks and when the cost of carrying the risk will be greater than the premiums being received.[11]

The amount which is required to cover petitioner's "obligation to renew" a particular level premium policy as that term is used in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., is thus an actuarially quantifiable dollar amount which can be computed on each periodic premium payment made with respect to each policy in force. Such amount (i.e., the amount representing petitioner's obligation to renew), actuarially computed, equals the amount by which the present value of future benefits to be paid under a particular policy exceeds the present value of future net valuation premiums (i.e., generally all future premiums to be received by the company) under that policy.

However, under the 2-year preliminary term method of computing mid-terminal reserves, the fact that petitioner included in its gross premium charge an amount intended to cover its obligation to renew which it admittedly incurred under its level premium policies was completely ignored for purposes of reserving. In fact, for purposes of reserving, policies less than 3 years old are treated as though they were nonrenewable, short-term policies under the 2-year preliminary term method. Thus, with respect to policies 2 years or less in force, petitioner was required to establish only short-term (unearned premium and unpaid loss) reserves and no provision was made to cover petitioner's obligation to renew. (For further discussion of this point, see *infra.*)

This point is made clear by the mechanics petitioner employed in computing its mid-terminal reserves. As the parties have stipulated: "Under a preliminary term method, the dollar amount of that [terminal] reserve is the excess of the

---

[11]S. Rept. 1631, *supra*, 1942–2 C.B. at 612.

present value of future benefits over the present value of future net valuation premiums on each renewable policy which has been in force for *more than the preliminary term* at the statement date, *but does not include any amount representing the excess of the present value of future benefits over the present value of future net valuation premiums on those renewable policies which have been in force for a period equal to or shorter than the preliminary term being used.*"[12] (Emphasis supplied.)

Thus, although it is clear that petitioner incurred an obligation to renew, and that that obligation to renew could be represented by an actuarially quantifiable dollar amount, it is also clear that, under the 2-year preliminary term method of reserving employed by petitioner, that amount representing its obligation to renew was not required to be placed into a terminal reserve *until and unless* the policy entered its third year. Premiums received with respect to all of petitioner's renewable policies in force 2 years or less were treated as totally earned at the end of each year and were therefore subject to unrestricted corporate use. In my opinion, there is simply no legitimate way that these policies 2 years or less in force can be said to be policies with respect to which a reserve in addition to unearned premiums must be carried to cover petitioner's obligation to renew within the meaning of sections 1.801-3(c) and 1.801-3(d), Income Tax Regs. Although the obligation to renew may exist during the policies' first 2 years, this obligation was not acknowledged and quantified by a reserve as these regulations specifically require.

The majority, in reaching the opposite result, appears to have been influenced by the testimony of the petitioner's experts that the 2-year preliminary term method is an actuarially sound method of computing reserves. Thus, the majority states in the companion case of *National States Insurance Co. v. Commissioner*, 81 T.C. 325 (1983) (Court reviewed), that the net level and the preliminary term methods of reserving are, *from the viewpoint of actuarial soundness*, "tweedledum and tweedledee." From this the

---

[12]See also Report of the Advisory Committee to the National Association of Insurance Commissioners, 1964; J. Magee, Life Insurance 564 (3d. ed. 1958); J. Maclean, Life Insurance 134–140 (8th ed. 1956).

majority concludes that since the policies reserved under the net level method would satisfy the definitional requisites of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., then policies reserved under the 2-year preliminary term method should also.

We are, however, not called upon in this case to determine the relative actuarial soundness of the preliminary term method reserving vis-a-vis the net level method. Considerations which give rise to an actuary's conclusion that a particular method of reserving is "sound" in any given context are, in my view, quite irrelevant for purposes of the issue we have before us in this case. Of primary concern to actuarial theory is the solvency of a company over time. As noted above, the Internal Revenue Code provisions here involved 'are ultimately concerned with the proper Federal tax classification of an insurance company.

Moreover, although no one will dispute that under the 2-year preliminary term method of reserving the amount accumulated in a reserve for a particular policy will ultimately be the same as under the net level method *if* the policy remains in force for the *entire policy term*, this fact should not be determinative. The salient fact here is that under the net level method, long-term reserves are required to be accumulated beginning with the first policy year, while under the 2-year preliminary term method, *no* long-term reserves are required to be established until and *unless* the policy enters its third year.

Policies reserved under the net level method thus meet the specific requirements of the sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., in their first year, their second year, and every subsequent year the policy is in force.[13] A certain

---

[13]The operation of the net level method of reserving in contrast to the 2-year preliminary term method is made apparent by certain stipulations of the parties in this case. As noted *supra,* the parties have stipulated (and the commentators bear this out, see note 12 *supra*), that under the 2-year preliminary term method, the dollar amount of the terminal reserve is computed by taking the excess of the present value of future benefits to be paid over the present value of future net valuation premiums on each policy that has been in force for *more than 2* years at the annual statement date, but does *not* include the amount representing the present value of future benefits over the present value of future net valuation premiums on policies in force less than 3 years. Under the net level method, on the other hand, the dollar amount of the terminal reserve consists of the excess of the present value of future benefits over the present value of future net valuation premiums on *each policy, regardless of the length of time the policy has been in force.*

percentage of each annual premium received with respect to such policies will therefore not be useable by the issuing company in the year received, and such policies should contribute positively to the issuing company's life insurance status, under the statutory scheme.

With respect to policies reserved on the 2-year preliminary term basis, however, the situation is quite different. No portion of the premiums received with respect to such policies will be required to be set aside in long-term reserves on either of the first 2 years of the policies' existence; nor will any contribution to the reserve with respect to those policies be made from any other source.[14] One hundred percent of such premiums will therefore be totally available to the issuing company for general corporate purposes and the specific requirement of an additional reserve contained in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., will not be satisfied *during those 2 years*. If the policy is canceled before it enters its third year, no additional reserve will have *ever* been required or maintained with respect to that policy and the specific definitional requirement of the regulations will therefore *never* have been satisfied.

This fundamental fact cannot be ignored. Accident and health insurance has, as a general rule, a relatively high early cancellation rate, and it cannot be doubted that a certain percentage of petitioner's renewable policies will be canceled by the insured before they enter their third year. This fact is, of course, considered by the actuary in determining whether a preliminary term method is "actuarially sound" since there is no actuarial reason for establishing long-term reserves with

---

[14]Although policies reserved under the 2-year preliminary term method will contribute to the terminal reserve at an accelerated rate vis-a-vis the net level method *if* such policies remain in force for more than 2 years, it is clear that the purpose of this accelerated contribution is to allow *that particular policy* to "catch up" for prior years when no amounts were contributed to offset risks which attached *to that policy*. These accelerated amounts therefore cannot be considered to be maintained "with respect to" policies still within the 2-year preliminary term. An example may aid in understanding this point. If petitioner issued a renewable accident and health insurance policy to an insured at age 30, the mid-terminal reserve would not include any amount attributable to such policy for the first 2 policy years under the 2-year preliminary term method. Only in the third policy year would the total mid-terminal reserve be affected by such policy, when an amount would then be added to or included in that total reserve. This amount would be based upon the excess of the present value of the future benefits over the present value of future net valuation premiums on such policy, computed as though the policy were then newly issued to an insured at age 32, and the additional reserve were being computed under the net level method.

respect to policies which can be predicted to be essentially short term.

Thus, although the 2-year preliminary term method of reserving may be actuarially sound, it is clearly not so because it requires the company to establish reserves in addition to unearned premiums to cover the company's long-term obligation to renew during the policies' first 2 years. It may be actuarially sound for reasons (e.g.; high early cancellation rate) which are completely irrelevant for purposes of determining the Federal tax classification of the policies with respect to which it is employed. The salient point here is that, under the method, no reserve in addition to unearned premiums is required to be established to cover petitioner's obligation to renew its policies 2 years or less in force and there can, in my opinion, simply be no argument based upon the relative actuarial soundness of the preliminary term method vis-a-vis the net level method.

### B. Petitioner's "Aggregate" Theory of Reserving

Petitioner argues that even though its policies in force 2 years or less did not contribute computationally to its mid-terminal reserves under the 2-year preliminary term method, it nonetheless should be considered to have maintained a reserve in addition to unearned premiums to cover its obligation to renew with respect to such policies. Petitioner argues that its mid-terminal reserves, as reflected on line 1, part 3A of schedule H of its annual statement, are properly viewed only as an aggregate liability carried *with respect to* all of its renewable policies within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., whether a particular policy contributes computationally to the reserve or not. The majority appears to have accepted this contention; I cannot.

Initially, the very language of the regulations we are interpreting in this case militates against such a conclusion. Sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., are drafted in the *singular*. They require that in order for *a* policy to be classified as noncancelable or guaranteed renewable it must be *an* accident and health contract which the insurance company is under an obligation to renew and *with respect to which* a reserve in addition to unearned premiums must be carried to cover *that obligation to renew*.

As noted above, the obligation to renew a particular policy can be represented by an actuarially quantifiable dollar amount. This amount constitutes the amount by which the present value of future benefits to be paid under the policy exceeds the present value of future net valuation premiums *on that policy*. Despite the fact that each of petitioner's policies 2 years or less in force may produce a positive dollar amount *if* it was subjected to the above calculation, under the preliminary term method of reserving, no amount will be contributed to a mid-terminal reserve *with respect to that policy*. Moreover, the amounts which actually contributed to a mid-terminal reserve *with respect to* other policies which have passed their third year of existence are only those amounts *assumed sufficient* to cover the actuarial risks attributable *to those policies* (see note 14 *supra*). No amounts are contributed to cover risks incurred on policies 2 years or less in force.

It can be conceded that the total dollar amount of a reserve is, in a sense, an aggregate amount, and that the term "reserve" has only limited significance when not viewed in the aggregate. To use respondent's example, the insured under a $1,000 face amount life insurance policy either will or will not die during the current policy year and the company's liability under the policy either will or will not mature. Thus, while the actuarial probability of death could be computed at the beginning of the policy year at, say, .00426, it would be meaningless to speak of a reserve of $4.26 to provide for the risk that the issuing company would have to pay a $1,000 death claim. The reserve simply means that the probability is that out of 1 million persons similarly situated, about 4,260 can be predicted to die within the period. Thus, the reserve is simply computed by multiplying .00426 by the number of $1,000 life exposures *falling within the class*, and the aggregate amount thus computed makes up the reserve.

However, the fundamental fact here is that the total dollar value of a reserve does not arise in a vacuum. This dollar figure is a result of the summation of actuarially computed dollar amounts derived from premiums paid on each individual policy which, under the valuation method selected by the insurer, are to contribute to the reserve. The aggregate amount thus computed represents the actuarial estimate of the amount *assumed sufficient* to meet claims which arise

under those policies which contribute computationally to the reserve. I do not think that these reserves can legitimately be considered to be maintained "with respect to" such noncontributing policies within the meaning of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., by invoking a convoluted "aggregate theory" of reserves. Indeed, the Supreme Court has, in an analogous context, specifically rejected the proposition that "reserves follow the risks." See *United States v. Consumer Life Insurance Co.*, 430 U.S. 725 (1977).

Petitioner's experts in this case have made much of the fact that all of the assets retained in petitioner's mid-terminal reserves are potentially available to meet the claims of insureds holding any renewable policy. However, this fact should not lead to the conclusion that such reserves are carried "with respect to" petitioner's renewable policies 2 years or less in force within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. As petitioner's expert conceded, the assets maintained in petitioner's mid-terminal reserve with respect to a particular class of policies, *as well as other company assets*, may become subject to the claims of *any* policyholder, whether the particular policy under which the insured asserts his claim contributed to the specific reserve or not. For example, if a company, issuing both a class of cancelable policies with respect to which no mid-terminal reserves are maintained, and a class of policies with respect to which it has accumulated mid-terminal reserves, finds that its unearned premiums and unpaid loss reserves are insufficient to satisfy claims arising under its cancelable policies during a particular year, it would nonetheless be required to satisfy claims arising under such policies out of its accumulated mid-terminal reserves (assuming unallocated surplus was insufficient to satisfy such claims). The same would be true with respect to petitioner's renewable policies in force less than 2 years. That is, if the gross unearned premium reserve maintained with respect to such policies proved inadequate to satisfy claims arising under such policies in a given year, petitioner would nevertheless be required to satisfy those claims out of its accumulated mid-terminal reserves even though such policies had never contributed any portion of their premiums to such reserve. In this sense, the company's *liability* on all of its contracts of insurance is an aggregate

liability. This fact should not be distorted to lead us to conclude that the additional reserve requirements of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., were satisfied by policies that in no way contribute to a long term reserve.

### III. Did Petitioner's Unearned Premium Reserves Contain Reserves in Addition to Unearned Premiums?

The majority found it unnecessary to address petitioner's argument that its unearned premium reserves on policies 2 years or less in force somehow contained a "reserve in addition to unearned premiums." Since I feel that the theories that the majority relies upon do not support its ultimate conclusion, I find it necessary to consider this argument.

Specifically, petitioner maintains that the term "unearned premiums," as defined in section 1.801–3(e), Income Tax Regs., was intended to refer to *net* rather than gross unearned premiums, and since petitioner maintained gross unearned premium reserves with respect to all of its renewable policies, including those in force 2 years or less, it in fact maintained reserves in *addition* to "unearned premiums" as that term is defined by the regulations. Additionally, petitioner points out that the premium charged for its renewable accident and health policies included an element which was intended to cover petitioner's obligation to renew the policy at a level premium. To the extent that this additional premium charge was included in the unearned premium reserve maintained with respect to each of its renewable policies, petitioner contends that reserves in addition to unearned premiums were required or carried to cover its obligation to renew such policies as required by sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

Sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., require that, in order to be classified as a noncancelable or guaranteed renewable policy for Federal tax purposes, a reserve in addition to unearned premiums must be carried to cover the issuer's *obligation to renew or continue the policy at a specified premium.* In its report accompanying the 1942 Act, the Senate Finance Committee clearly articulated the types of reserves which it contemplated to fall within the definition of "reserves in addition to unearned premiums." Such reserves included:

Those amounts must be reserved * * * to provide for the additional cost of carrying [noncancelable] policies *in later years* when the insured will be older and subject to greater risk *and when the cost of carrying the risk will be greater than the premiums being received.* [Emphasis supplied.][15]

The reserve contemplated is thus a long-term reserve. However, the unearned premium reserve, whether maintained on a gross or net basis, and whether maintained with respect to cancelable or renewable policies, is inherently incapable of serving this long-term function. Such reserve merely represents the pro rata portion of the current gross or net premium which remains unearned on the annual statement date, and is intended to cover the cost of claims (if the net unearned premium is used), or the cost of claims and non-insurance expenses (if the gross unearned premium is used), which arise during the unexpired portion of the *current* premium-paying period. The unearned premium reserve, again whether maintained on a gross or net basis, diminishes ratably over the premium-paying period, so that at the end of such period, no amount of the current premium can ever remain in the reserve to cover future risks under the policy.[16] Thus, no portion of the gross or net unearned premium reserve can even arguably serve the function of a "reserve in addition to unearned premiums" as that term was intended in sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Cf. *Economy Finance Corp. v. United States, supra* at 481; *Group Life & Health Insurance Co. v. United States, supra.*

Moreover, an acceptance of petitioner's interpretation of section 1.801–3(e) would necessarily lead to the conclusion that any company which maintains unearned premium reserves on the gross, rather than the net basis, carries a reserve "in addition" to unearned premiums within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. This conclusion would necessarily follow even though such reserves are maintained with respect to cancelable policies, and would require us to equate the "additional reserves" required by

---

[15]S. Rept. 1631, *supra*, 1942–2 C.B. at 612.

[16]And this will be true even if under the actual experience of the company, the entire unearned premium reserve is not expended for current claim costs and expenses. Such excess amounts do not become part of a terminal or mid-terminal reserve, but rather become company surplus. See J. Maclean, *supra* at 134–140.

sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., with the loading element contained in the gross unearned premium reserve. Such a conclusion would be demonstratably fallacious.

No obligation to renew accompanies a cancelable policy, and it is therefore axiomatic that the issuer of such policies will never be required to maintain a reserve in addition to unearned premiums within the intendment of sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Nevertheless, the absolute minimum reserve required for cancelable accident and health insurance in petitioner's State of incorporation, is the gross pro rata unearned premium. See sec. 219.1 N.Y. Insurance Regs. This application of petitioner's proposed interpretation of section 1.801–3(e), Income Tax Regs., shows quite clearly that the Treasury could not have intended to limit the definition of unearned premium reserves to "net" unearned premiums.

Furthermore, petitioner's interpretation cannot withstand scrutiny even when applied to renewable policies. The loading element contained in a gross unearned premium represents that portion of the gross premium designed to cover non-insurance costs, such as commissions and administrative expenses, and also includes a margin for profit. Such amounts clearly are not carried to cover the insurer's obligation to renew or continue the policy at a specified premium, and therefore are not capable of being classified as "reserves in addition to unearned premiums" under sections 1.801–3(c) and 1.801–3(d), Income Tax Regs. Petitioner's proposed interpretation of section 1.801–3(e), Income Tax Regs., would, however, lead directly to such a result.

The fact that petitioner charged a greater premium rate in the case of renewable policies than it would have charged for policies with the same terms but without the renewable feature is, in my opinion, completely without significance for purposes of the present case. Although it is clear that the premium charged with respect to petitioner's renewable policy included an amount which was intended to cover petitioner's obligation to renew at a level premium, under the 2-year preliminary method, petitioner was entitled to assume, *for purposes of reserving*, that the entire premiums paid with respect to its renewable policies during each of their first 2 years of existence would be used to pay expenses and insur-

ance claims occuring during each of the first 2 policy years. As such, no amounts of those premiums remained available at the end of the first 2 policy years with which petitioner could establish mid-terminal reserves.

The entire concept of an insurance company's taxable status is based upon the qualitative nature of the reserves the company is required to maintain. *Group Life & Health Insurance Co. v. United States, supra* at 117; *Alinco Life Insurance Co. v. United States*, 178 Ct. Cl. at 833-834, 373 F.2d at 347; *Commissioner v. Swift & Co. Employees Benefit Association*, 151 F.2d 625 (7th Cir. 1945). Premiums charged with respect to particular types of policies are irrelevant for these purposes. The salient point here is that the unearned premium reserve, whether maintained on the gross or net basis, and whether maintained with respect to cancelable or noncancelable policies, is simply not, in my opinion, the qualitative type of reserve that the Treasury intended to include within its definition of a "reserve in addition to unearned premiums" under sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

Finally, notwithstanding petitioner's contention to the contrary, I think that the specific language of section 1.801–3(e), Income Tax Regs., militates against petitioner's effort to limit the definition of the unearned premium reserve to net unearned premiums. Section 1.801–3(e), Income Tax Regs., defines "unearned premiums" as "those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance." These amounts are defined to include "all unearned premiums, whether or not required by law." It is clear that the draftsman of the regulation considered the unearned premium to represent the pro rata portion of the total premium allocable to the unexpired portion of the policy term when that term was defined to encompass *all* unearned premiums, even though the gross unearned premium may contain an element of loading. As stated by the Court of Appeals in *Superior Life Insurance Co. v. United States*, 462 F.2d 945, 951 (4th Cir. 1972):

The universally accepted meaning of "premium" is the amount paid by the insured for coverage. It does not refer to any particular portion of the sum paid by the insured. * * * Our interpretation is not inconsistent with * * * [sec. 1.801–3(e), Income Tax Regs.]; both the morbidity portion and the

loading portion are, we think, "costs" of insuring. * * * Until a prorated portion of the premium is earned, no loading costs are considered due against it. In this sense, the *total* unearned premium is a "reserve" for future obligations. [Emphasis in original; fn. ref. omitted.]

See also *Union Mutual Life Insurance Co. v. United States*, 570 F.2d 382 (1st Cir. 1978), cert. denied 439 U.S. 821 (1978); *Group Life & Health Insurance Co. v. United States, supra.*

I would therefore reject petitioner's contention that the gross pro rata unearned premium reserve which was maintained with respect to its renewable policies contained a reserve in addition to unearned premiums as required by sections 1.801–3(c) and 1.801–3(d), Income Tax Regs.

## IV. Other Points

The majority feels that certain other provisions of subchapter L and the regulations thereunder support its ultimate conclusion on the main issue in this case. For the reasons stated hereafter, I do not agree.

## A. SECTION 818(c)

Life insurance companies, like all insurance companies, are permitted to deduct annual additions to reserves for purposes of computing taxable income. *If* a company qualifies as a life insurance company, and values mid-terminal reserves on a preliminary term method, it *may* elect to compute the deduction for annual additions to reserves on the net-level basis, even though it, in reality, uses a preliminary term method. Sec. 818(c).

The election under section 818(c) may, from a tax perspective, prove beneficial to a life insurance company in one year, and prove disadvantageous to such company in a later year. However, once the election is made, it cannot be withdrawn by the company without permission of the Commissioner.

The majority asserts that our interpretation of the regulations would "undermine section 818(c)."

This argument, in my opinion, places the cart before the horse. Only "life insurance companies" are entitled to the specific relief contained in section 818(c). Section 818(c) has nothing to do with the definition of such a company. Indeed, the legislative history of section 818(c), cited by the majority,

speaks of "life insurance companies" throughout, and refers to the equalization of reserve deduction treatment among "life insurance companies."

If it is determined that the company does not meet the "life insurance company" test of section 801, such company was simply not intended to benefit from the provisions of 818(c). Thus, only if one presupposes that the companies we have before us are the types of companies Congress intended to treat as "life insurance companies," can one conclude that my interpretation of the regulations "undermines section 818(c)." In fact, Congress, in my opinion, did not intend such companies to be treated as "life insurance companies." Congress, in section 818(c), simply noted one possible adverse tax consequence of the use by a "life insurance company" of the preliminary term method, and chose to provide relief, and has not seen fit to legislate with respect to the effect of the preliminary term method on an insurance company's tax status. We clearly may not do so here.

B. SECTION 1.801–3(b) (2), INCOME TAX REGS.

Section 1.801–3(b)(2), Income Tax Regs., provides:

An insurance company writing only noncancellable life, health, or accident policies *and having no "life insurance reserves"* may qualify as a life insurance company if its unearned premiums, and unpaid losses (whether or not ascertained), on such policies comprise more than 50 percent of its total reserves. [Emphasis supplied.]

The majority believes that my interpretation of sections 1.801–3(c) and 1.801–3(d) of the regulations (i.e., that a company must carry a "reserve in addition to unearned premiums" with respect to every policy that it seeks to classify as noncancelable or guaranteed renewable), is incompatible with the above regulation. The majority states that the situation contemplated in section 1.801–3(b)(2), Income Tax Regs. (i.e., that a company could qualify as a "life insurance company" even though it has no "life insurance reserves"), could never arise under our interpretation of sections 1.801-3(c) and 1.801-3(d), Income Tax Regs., since the company would have to have "life insurance reserves" in order for its policies to qualify as "noncancellable" or "guaranteed renewable" in the first place. I disagree.

"Life insurance reserve" is a term of art, specifically defined in section 801(b). See also sec. 1.801–4(a), Income Tax Regs. Briefly stated, in order to qualify as a "life insurance reserve," such reserve must generally meet a five-part test.

(1) It must be computed or estimated on the basis of recognized mortality or morbidity tables;

(2) It must have assumed rates of interest;

(3) It must be set aside to mature or liquidate future unaccrued claims;

(4) It must involve life, health, or accident contingencies; and

(5) It must be required by law.

Whether a particular reserve established by a company qualifies as a technical "life insurance reserve" has been a much-litigated issue. See, e.g., *Helvering v. Inter-Mountain Life Insurance Co.*, 294 U.S. 686 (1935); *Maryland Casualty Co. v. United States*, 251 U.S. 342 (1920); *Group Life & Health Insurance Co. v. United States*, 660 F.2d 1042 (5th Cir. 1981); *Mutual Benefit Life Insurance Co. v. Commissioner*, 488 F.2d 1101 (3d Cir. 1973), affg. 58 T.C. 679 (1972), cert. denied 419 U.S. 882 (1974); *Lamana-Panno-Fallo Industrial Insurance Co. v. Commissioner*, 127 F.2d 56 (5th Cir. 1942); *Delta Life Insurance Co. v. United States*, 363 F. Supp. 410 (E.D. La. 1973); *Central National Life Insurance Co. of Omaha v. United States*, 216 Ct. Cl. 260, 574 F.2d 1067 (1978).

However, in order to be classified as a "noncancellable" or "guaranteed renewable" accident or health policy, sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., *do not* require that policy to first run the gauntlet of section 801(b). That is, under these regulations, whether the company maintains technical "life insurance reserves" with respect to such policies is irrelevant in their Federal tax classification. All sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., require is that the health or accident policy be a "long-term" policy *"with respect to which a reserve in addition to unearned premiums must be carried"* to cover the company's long-term obligation under the policy. The regulations do not require that the policy be one with respect to which a technical "life insurance reserve" be carried. The Treasury, when drafting these regulations did not deem it necessary to inquire whether a "reserve in addition to unearned premiums" met the technical "life insurance reserves" test of section 801(b) when

the reserves were being examined solely for purposes of determining whether policies should be classified as noncancelable or guaranteed renewable. For these purposes, it is sufficient that the reserves be carried to cover a company's long-term obligation under the policy to renew at a level premium, a test somewhat *less* stringent than that provided for technical "life insurance reserves."

Of course, if the "reserve in addition to unearned premiums" does not meet the technical "life insurance reserve" definition of section 801(b) and section 1.801-4(a), Income Tax Regs., it will not be placed in the numerator of the section 801 qualification ratio since under section 801 only "life insurance reserves" and unearned premiums and unpaid losses on noncancelable or guaranteed renewable life, health, or accident policies are so included by the specific terms of the statute. Nevertheless, this regulation recognizes that a company issuing "guaranteed renewable" or "noncancellable accident" and health policies will qualify as a "life insurance company" if the more than 50-percent test of section 801(a) is met, even if the "reserve in addition to unearned premiums" which the company is required to carry for definitional purposes under sections 1.801-3(c) and 1.801-3(d), Income Tax Regs., does not meet all of the technical requirements of a "life insurance reserve" contained in section 801(b). See Rev. Rul. 67-224, 1967-2 C.B. 231. Moreover, under such circumstances the 50-percent test will only be satisfied if unearned premiums and unpaid losses on such policies comprise (exclusive of "additional reserves") more than 50 percent of the company's total reserves.

### V. Are Sections 1.801-3(c) and 1.801-3(d), Income Tax Regs., Valid?

Petitioner contends that these regulations, as I would interpret them, are invalid exercises of the Treasury's interpretive authority. Petitioner contends that Congress intended the industry definition of "noncancellable" and "guaranteed renewable" accident and health policies to be controlling for Federal tax purposes and that its policies clearly meet the definitional standards of the insurance industry. The majority appears to have been swayed by this argument.

Petitioner's three experts testified that petitioner's policies would indeed be classified as "noncancellable" or "guaranteed renewable" in the insurance industry. However, these experts also testified that the insurance industry classifies such policies solely by reference to the terms of the policies and does not consider whether a "reserve in addition to unearned premiums" is required to cover the issuer's obligation to renew to be a relevant definitional criterion. In fact, the parties have stipulated that:

"Noncancellable" and "guaranteed renewable" A & H contracts or policies are recognized product types in the insurance industry, *which bases such classification solely upon the terms or provisions of the policy (or rider)*. [Emphasis supplied.]

However, Congress was clear when it stated the requisites for "noncancellable" and "guaranteed renewable" status for Federal tax purposes. Such a policy—

means a contract which the insurance company is under an obligation to renew at a specified premium *and* with respect to which a reserve in addition to unearned premiums must be caused to cover the renewal obligation. [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 612. Emphasis supplied.]

Congress thus specified the essential prerequisite of a long-term reserve to the Federal tax classification of an accident and health policy as "noncancellable" or "guaranteed renewable." Since the industry standard, as articulated by petitioner's experts, would not impose such a prerequisite, I cannot find the industry definition to be controlling. Cf. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979); *Modern Life & Accident Insurance Co. v. Commissioner*, 49 T.C. 670, 672 (1968), affd. 420 F.2d 36 (7th Cir. 1969). As the Seventh Circuit Court of Appeals has stated in *Economy Finance Corp. v. United States, supra* at 482:

Taxpayers further contend that in the insurance industry "noncancellable" means a policy which the insurance company cannot cancel and that Congress intended the meaning attached by the business which evolved the term. But Congress was specific as to the *combined* features of a "noncancellable" policy for tax purposes. Taxpayers' policies do not fit within the framework of the statutory definition. [Emphasis supplied. Fn. ref. omitted.]

See also *Group Life & Health Insurance Co. v. United States, supra*.

In short, sections 1.801–3(c) and 1.801–3(d), Income Tax Regs., are clearly not "unreasonable and plainly inconsistent" with sections 801(a) and 801(e) and must, therefore, be sustained. *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948).

---

For the above reasons, I would hold that, for Federal tax purposes, petitioner failed to meet the statutory test of a "life insurance company" for the period before us, it being conceded that it fails to meet the over-50-percent test of section 801(a), unless its unearned premiums and unpaid losses attributable to its long-term health and accident policies, during their first 2 years of existence, are added to the numerator of the statutory fraction. Since the majority holds to the contrary, I dissent.

FAY, STERRETT, CHABOT, and PARKER, *JJ.*, agree with this dissenting opinion.