UNITED FIRE INSURANCE COMPANY, Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 84–1761.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 10, 1985.

Decided July 19, 1985.

---

John L. Snyder, Hopkins & Sutter, Chicago, Ill., for petitioner-appellee.

Richard Farber, Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellant.

Before ESCHBACH, POSNER, and COFFEY, Circuit Judges.

ESCHBACH, Circuit Judge.

This is an appeal by the Commissioner of Internal Revenue from the decision of the Tax Court that United Fire Insurance Company qualified as a life insurance company, within the meaning of § 801(a) (now § 816(a)) of the Internal Revenue Code, during the years 1973, 1974, and 1975, 81 T.C. 368 (1983). We affirm.[1]

I.

United Fire Insurance Co. ("United") is a stock fire and casualty insurance corporation organized under New York law, with its principal place of business in Chicago, Illinois. In the early 1970's United began to expand its business by issuing policies of accident and health insurance to individuals. These policies, for the most part, were renewable at the option of the insured. Some of them guaranteed the insured the right to renew at a specific, unadjustable premium rate. In the terminology of the insurance industry, policies of this type are known as "noncancellable." Most of United's accident and health policies, however, permitted an adjustment to the premium on renewal to reflect the company's experience with the type of policy involved (but not to reflect the increased age of the insured). Policies of this sort are known as "guaranteed renewable."

The gross premium charged has two components: the net premium and "loading." The net premium is the actuarially computed amount required to provide for

1. We note that the Court of Appeals for the Eighth Circuit has recently affirmed the decision of the Tax Court in favor of the insurance company in a companion case presenting the same issue. *See National States Insurance Co. v. Commissioner,* 81 T.C. 325 (1983), *aff'd,* 758 F.2d 1277 (8th Cir.1985).

payment of the benefits promised under the policy. "Loading" is the amount required to cover the insurer's other costs, including commissions, administrative expenses, and profit.

New York State regulations require United to maintain an "active life reserve" with respect to its noncancellable and guaranteed renewable accident and health policies. This reserve is a fund for the payment of future claims. It has two components: the "unearned premium reserve," which provides for claims and benefits that will be incurred during the remainder of the current policy term, and the "additional reserve," which provides for claims and benefits arising after the current term, as a result of policy renewals. Such an additional reserve is necessary because in the later years of these policies, when the insureds experience advancing age and declining health, the cost of claims will exceed the net premiums.

Reserve requirements are computed not for each individual policy but for whole groups or classes of them. State regulatory provisions permit alternative methods of calculation. Under the "net level method" the dollar amount of the additional reserve is computed by calculating the excess of the present value of future benefits payable under all policies in the class over the present value of future net premiums. Under the "two-year preliminary term method"[2] the dollar amount of the additional reserve is computed by calculating the excess of the present value of future benefits over the present value of future net premiums on all policies in the class that have been in force for more than two

years. Policies in the class that have been in force for less than two years are not represented in this computation. In effect, the method treats policies in their first two years as if they were term policies, though in fact the policyholders have a right of renewal.[3] At all times pertinent to this case, United used the two-year preliminary term method to compute its additional reserves with respect to its noncancellable and guaranteed renewable accident and health policies.

■ Insurance companies which qualify as "life insurance companies" under § 801(a) of the Internal Revenue Code, 26 U.S.C. § 801(a),[4] are eligible for special tax treatment. *See infra* pp. 167–68. A company that writes no life insurance but issues noncancellable or guaranteed renewable contracts of accident and health insurance still qualifies as a "life insurance company" if its "life insurance reserves" (as defined in I.R.C. § 801(b)) plus its unearned premiums and unpaid losses on such policies comprise more than 50 percent of its total reserves. I.R.C. § 801(a). This is known as the "reserve ratio test." For reasons that it is unnecessary to detail, United's tax liability for 1972 depends on whether it was a "life insurance company" in 1973, 1974, and 1975. The Commissioner took the position that United was not a "life insurance company" in those years and issued a deficiency determination for 1972. United brought this action in Tax Court, contesting the deficiency. The Tax Court, with five judges dissenting, ruled in favor of United, and the Commissioner now appeals from this ruling. *United Fire In-*

---

**2.** A preliminary term of one year may also be used, although two years is more common with accident and health policies and was the term used by United.

**3.** The administrative expenses in the first year or two of a renewable policy are much higher than in later years and often exceed the loading portion of the gross premium. The two-year preliminary term method allows the insurance company to recover a greater portion of its initial expenses in the years in which those expenses are incurred. There is no ultimate impairment of reserves, because the contribu-

tion to additional reserves with respect to a policy in its third and later years is greater when the two-year preliminary term method is used than when the net level method is used. Thus over time the relative deficiency is made up.

**4.** All statutory references are to the Internal Revenue Code of 1954, as it was in effect during the tax years in question. The Code sections treating of life insurance companies were rearranged in 1984; section 801 is now numbered 816.

*surance Co. v. Commissioner,* 81 T.C. 368 (1983).

## II.

The regulations promulgated by the Commissioner under I.R.C. § 801 include special definitions of "noncancellable" and "guaranteed renewable." Treas.Reg. § 1.801–3(c), –3(d). In order to qualify as noncancellable or guaranteed renewable within the meaning of the reserve ratio test, accident and health insurance policies must conform to these definitions. In identifying its noncancellable and guaranteed renewable accident and health policies, United included policies that were less than two years old. The Commissioner contests this inclusion. The parties agree that the dispositive issue is whether accident and health insurance policies in force for less than two years can be "noncancellable" or "guaranteed renewable" within the meaning of § 1.801–3(c) and (d) of the Commissioner's regulations when the taxpayer uses the two-year preliminary term method of calculating the amount of the additional reserve required for the entire class of policies in which the less-than-two-year-old policies are included.

Section 1.801–3 of the regulations reads in pertinent part as follows:

(c) *Noncancellable life, health, or accident insurance policy.* The term "noncancellable life, health, or accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which the insurance company is under an obligation to renew or continue at a specified premium and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation....

(d) *Guaranteed renewable life, health, and accident insurance policy.* The term "guaranteed renewable life, health, and accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes in accordance with its experience under the type of policy involved, and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation....[5] Each definition imposes two conditions. In rough paraphrase, the company must be under an obligation to renew the policy and it must carry an additional reserve with respect to the policy to cover that obligation. The parties do not dispute that the policies in question satisfy the first condition: United is under an obligation to renew them. The dispute centers entirely on the second condition, the requirement of an additional reserve.

The Tax Court held that policies less than two years old meet the additional reserve requirement, even though no additional reserves are actually computed with respect to them during their two-year preliminary term. This is a conclusion of law, and our review is de novo. No purely factual questions are in dispute. *See Manocchio v. Commissioner,* 710 F.2d 1400, 1402 (9th Cir.1983) (Tax Court's application of law to undisputed facts is reviewable de novo).

The Commissioner's principal argument is simple and at first blush compelling. A "noncancellable" or "guaranteed renewable" policy is one with respect to which an additional reserve must be carried. Because United has elected to use the two-year preliminary term method of computing the reserves needed to cover its obligation to renew, no additional reserve must be carried with respect to its accident and

---

5. Paragraph (e) reads as follows:

(e) *Unearned premiums.* The term "unearned premiums" means those amounts which shall cover the cost of carrying the insurance risk for the period for which the premiums have been paid in advance. Such term includes all unearned premiums, whether or not required by law.

health policies during the first two years they are in effect. Therefore, the Commissioner concludes, United's policies do not qualify as noncancellable or guaranteed renewable during their first two years of existence.

The Commissioner finds additional support for his conclusion in the nature of the special tax treatment given to "life insurance companies" and the reasons for it. Before 1921 a life insurance company's gross income included the premium payments it received from its policyholders. *Helvering v. Oregon Mutual Life Insurance Co.*, 311 U.S. 267, 269, 61 S.Ct. 207, 208, 85 L.Ed. 180 (1940). But a considerable portion of a life insurance company's premium receipts is set aside in reserves to cover future claims. Money put into reserves is not available for general corporate purposes but is analogous to permanent capital investment. *Id.* In the Revenue Act of 1921 Congress recognized the inequity of imposing an income tax on receipts put immediately into long-term reserves and accordingly allowed life insurance companies to exclude all premium income from gross income. *Id.* Now, life insurance companies are allowed to deduct the annual increases in various reserves.[6] *See* I.R.C. §§ 809(d)(2), 810(b), (c).

Because the special tax treatment of life insurance companies derives from the reserves that state law requires such companies to maintain, it is not surprising that the definition of "life insurance company" that determines eligibility for this special treatment should also be based on those reserves. Recognizing that many insurance companies offer both term insurance of various kinds and life insurance policies requiring long-term reserves, Congress chose to limit eligibility for special treatment to those companies whose statutory reserves for life insurance predominate over other reserves. Accordingly, it adopted the definition of "life insurance company" found in I.R.C. § 801(a) and extended eligibility only to "life insurance companies" thus defined.

In the Revenue Act of 1942 Congress expanded the definition of a life insurance company to include noncancellable contracts of accident and health insurance in the reserve ratio test. *See Alinco Life Insurance Co. v. United States*, 373 F.2d 336, 347–48 (Ct.Cl.1967). In explaining this action, Congress said:

> Since noncancelable contracts of health and accident insurance require the accumulation of substantial reserves against increased future risks, the writing of such insurance is analogous to life insurance and the definition has been changed to permit such companies to be taxed as life insurance companies.

S.Rep. No. 1631, 77th Cong., 2d Sess. 144–45 (1942), *reprinted in* 1942–2 C.B. 504, 611–12.[7] From this it appears that the only reason Congress had for treating noncancellable contracts of health and accident insurance as similar to life insurance policies for purposes of the reserve ratio test is that such policies "require the accumulation of substantial reserves against increased future risks."

Because the special tax treatment of life insurance companies derives from the perceived inequity of imposing an income tax on receipts funneled immediately into reserves, the Commissioner infers that the kind of insurance policy that supports a company's classification as a life insurance company ought to be a policy that is taken into account in the computation of the amount of the long-term reserve. And since income tax liability is computed annually and a company's status as a life insurance company must be reestablished annually, the Commissioner infers further that in a given tax year only those policies which are taken into account in calculating the amount to be added to additional re-

---

6. This is not, of course, the only tax consequence of being a life insurance company. *See* I.R.C. §§ 801–820.

7. Congress later added a provision requiring that guaranteed renewable life, accident, and health insurance be treated in the same manner as noncancellable life, accident, and health insurance. I.R.C. § 801(e).

serves during that year should weigh in support of the company's being a life insurance company. But if this is the test, then policies reserved under the two-year preliminary term method clearly cannot qualify during their first two years.

■ We ordinarily accord great deference to an agency's interpretation of its own regulations. But even so, we need not follow the agency's interpretation when there are compelling indications that it is wrong. *Foulkes v. Commissioner*, 638 F.2d 1105, 1110 n. 17 (7th Cir.1981). In this case the grounds for deference are diminished by the fact that the language of the regulations in question did not originate with the Commissioner but was taken almost verbatim from the Senate Report on the Revenue Act of 1942, where we read:

> As the term is used in the industry, a noncancelable insurance policy means a contract which the insurance company is under an obligation to renew at a specified premium, and with respect to which a reserve in addition to the unearned premium must be carried to cover the renewal obligation.

S.Rep. No. 1631, 77th Cong., 2d Sess. 144–45 (1942), *reprinted in* 1942-2 C.B. 504, 612. We do not suppose that the Commissioner intended, or was empowered, to adopt a definition of "noncancellable policy" more restrictive than that contemplated by Congress; thus our inquiry is really into the intent of Congress.[8]

The Tax Court, in interpreting Congress's intent, placed great emphasis on its use of the phrase "As the term is used in the industry...." The Tax Court discerned in this an intent to adopt the industry definition. The court found, and the Commissioner admits, that under current industry usage the preliminary term method of reserving does not affect a policy's status as noncancellable, even during the preliminary term. But the invited conclu-

sion—that Congress intended that an otherwise noncancellable policy should remain noncancellable during the preliminary term when the preliminary term method is used—does not follow. The preliminary term method of reserving was not used with noncancellable accident and health policies in 1942,[9] and we think it clear that Congress did not focus its attention on the issue presented by this case. While it does appear that Congress intended to follow industry usage in 1942, we do not suppose that Congress intended to abide any future changes in industry practice, sight unseen. This bit of legislative history thus does not provide clear guidance, and we shall not rely on it.

Nevertheless, we affirm the Tax Court's holding because we believe that the plain language of the regulations supports United's position over the Commissioner's. The crucial words, found in both sections 1.801–3(c) and 1.801–3(d), are the following:

> with respect to which a reserve in addition to the unearned premiums ... must be carried to cover that obligation.

It appears to us that the renewable accident and health policies of United meet this requirement during their first two years. Even if it is true (and we shall focus on this question next) that no additional reserve is actually carried with respect to such a policy during its first two years, still the policy is of such a kind that an additional reserve *must be carried*—and will eventually be carried—with respect to it. The fact that actual contributions to the reserve with respect to such a policy are not made until the third year does not detract from the fact that United is required to carry a reserve with respect to it. The Commissioner would have us impose on the regulation an additional restriction, as if it read "must be carried ... *during the year in question*." We do not believe that such a restriction is implicitly contained in the actual language.

---

**8.** Hereafter, when we speak of a "noncancellable" policy, we mean "noncancellable or guaranteed renewable."

**9.** The National Association of Insurance Commissioners first gave its approval in 1957 to the two-year preliminary term method of reserving for noncancellable accident and health insurance.

But even if that restriction were implicitly there, it is not obvious that policies in their first two years would not still meet the requirement, provided that an additional reserve exists in the year in question as a result of contributions made with respect to other policies over two years old.[10] An additional reserve, once established, is carried for a class of policies without regard to their age. While the amount of the reserve may be determined by reference only to policies over two years old, the reserve is applicable to all policies of the class—even to those in force for less than two years. In such circumstances it appears perfectly sound to conclude that a reserve is carried during the year in question with respect to all policies of the class, even though the dollar amount of the reserve is computed by reference to fewer than all of those policies.[11]

While there is some force in the Commissioner's argument from the history and purposes of the special tax treatment of life insurance companies, the argument is not sufficient by itself to persuade us that the regulations in question must be construed, against their plain language, as incorporating an additional restriction. It is entirely reasonable to identify noncancellable policies by the dual obligation to renew and to carry a reserve to cover the renewals, without regard to relatively minor variations in the manner of funding the additional reserve. If the contribution to the additional reserve in a given year with respect to a policy is zero as a result of the use of a preliminary term method of funding reserves, this fact would not be without effect on the status of the company as a life insurance company. Assuming that the additional reserve qualifies as a life insurance reserve under I.R.C. § 801(b),[12] the life insurance reserves of the company may be less as a result of the zero contribution than they would have been if the net level method had been used:[13] If so, then when the reserve ratio test of § 801(a) is applied, the amount of the life insurance reserves inserted into the numerator and denominator will be less (by the same amount), and the percentage value of the ratio will therefore be less. Thus even under the "dual obligation" reading of the regulations, a company like United might fail to qualify as a life insurance company when it uses a preliminary term method of reserving, although it would have qualified if it had used the net level method. Given a suitable distribution of policies of different kinds and ages, the life insurance reserve if figured by the preliminary term method could put the reserve ratio just short of the 50% line in a given year, but if figured by the net level method just over it.[14]

10. United satisfies this proviso for all years in question. It entered the health and accident field in 1969 by acquiring existing policies of another insurer. A substantial portion of these policies were in effect in 1968 or earlier, and United's 1970 Annual Statement reflected additional reserves.

11. The Commissioner argues vigorously that no reserve can properly be said to be carried with respect to a policy when the policy is not taken into account in computing the amount of the reserve. Noting once again that reserves are carried for classes of policies and not for each individual policy, we think a reserve can quite legitimately be said to be carried with respect to a policy if the policy belongs to a class of policies for which a reserve is carried that is funded on an actuarially sound basis, whether or not the policy affects the amount of the reserve in a given year. The Commissioner does not deny that the two-year preliminary term method of reserving, as practiced by United, is actuarially sound.

12. An additional reserve is not a "life insurance reserve" unless it meets the definitional requirements of I.R.C. § 801(b) and Treas.Reg. 1.801–4(a). It appears, though, that all fifty states impose these requirements on additional reserves.

13. We say "may" rather than "will" because the absence of a contribution with respect to policies in their first two years may be offset by the comparatively higher contributions with respect to policies over two years old.

14. We provide an artificial example to illustrate the point. Assume that a company sells both casualty insurance and noncancellable accident and health insurance, funds its additional reserve for accident and health policies by the net level method, and has no unpaid losses. Its total casualty reserves are $500,000. Its total accident and health reserves are $550,000, of which $350,000 belong to the unearned premium reserve and $200,000 belong to the addition-

To segregate the noncancellable policies from others on the basis of the dual obligation to renew and to carry a reserve and then to allow the method of reserving for those policies to have its due effect on the reserve ratio appears to us to be a rational and eminently defensible way of applying the test for "life insurance company" to companies offering noncancellable accident and health policies. This is the system that the language of the regulations themselves appears to support, and we cannot see that this system is less in harmony with the underlying purposes of the special tax treatment of life insurance companies than the Commissioner's. Indeed, it appears to us by comparison that the Commissioner's position gives excessive and procrustean effect to a universally accepted reserving convention. It effectively converts policies that are uncontroversially noncancellable in the non-tax world into simple term policies in their first two years, despite the fact that the company bears all the obligations of noncancellability during those years and reserves for those policies in an actuarially approved way.

These considerations induce us to conclude that it is more likely than not that Congress originally intended and would still intend to make the twin obligations to renew and to carry a reserve to cover renewals the essential criteria of noncancellability, without regard for the manner of funding that reserve. In any event, if the rule is to be changed, we think the change must come from Congress.

We might find greater merit in the Commissioner's position if it appeared that the preliminary term method of reserving were purely and simply a tax avoidance device. Congress cannot be expected to anticipate every possible contrivance of human ingenuity to maneuver around well-considered language that appears facially adequate to its purpose. But the preliminary term method has been widely adopted by insurance companies primarily for sound business reasons. *See supra* note 3. It has been accepted and approved by the National Association of Insurance Commissioners and by all fifty states. . The Commissioner does not suggest that the preliminary term method is merely a tax avoidance device, and we find nothing in the record to support such a conclusion.

### III.

We therefore join with the Court of Appeals for the Eighth Circuit [15] and hold that accident and health insurance policies that are otherwise noncancellable or guaranteed renewable remain so during the period of the preliminary term when they are reserved by the two-year preliminary term method, for purposes of the reserve ratio test for qualification as a life insurance company under I.R.C. § 801(a).[16] The decision of the Tax Court is accordingly

AFFIRMED.

---

al reserve, which qualifies as a life insurance reserve. The denominator of this company's reserve ratio is thus the sum of $500,000 and $550,000, or $1,050,000. The numerator is $550,000, and the percentage value of the ratio is 52%.

Now assume that the company funds its additional reserve by the two-year preliminary term method but is otherwise the same. Its total casualty reserve remains $500,000. Its unearned premium reserve for accident and health policies remains $350,000, but (we shall assume) its additional reserve is only $100,000, because it has made no contributions with respect to policies less than two years old. Its total accident and health reserves are thus

$450,000. The denominator of the company's reserve ratio is now the sum of $500,000 and $450,000, or $950,000. The numerator is $450,000, and the percentage value is 47%.

**15.** *See supra* note 1.

**16.** Our holding today is in harmony with our earlier case, *Economy Finance Corp. v. United States,* 501 F.2d 466 (7th Cir.1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975), in which we held that health and accident policies were not "noncancellable," as the term is used in I.R.C. § 801(a), where the issuing company carried no additional reserve whatever with respect to them.